839 F.2d 47
 56 USLW 2454, 56 USLW 2510, Fed. Sec. L.
Rep. P 93,615
 SECURITIES INDUSTRY ASSOCIATION, Petitioner-Cross-Respondent,
v.
BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM, Paul A.
Volcker, as Chairman of the Board of Governors of the
Federal Reserve System, Manuel H. Johnson, Wayne D. Angell,
Robert H. Heller, and Martha R. Seger, as members of the
Board of Governors of the Federal Reserve System, Respondents,
Bankers Trust New York Corporation, J.P. Morgan & Co.
Incorporated, and Citicorp and The Chase Manhattan
Corporation, Manufacturers Hanover Corporation, and Chemical
New York Corp., Security Pacific Corporation,
Intervenors-Respondents Cross-Petitioners.
 Nos. 1488-1494, Dockets 87-4041, 87-4055, 87-4057, 87-4059,
87-4061, 87-4063, 87-4067, 87-4069, 87-4071,
87-4073, 87-4075, 87-4077, 87-4079 and 87-4085.
 United States Court of Appeals,
Second Circuit.
 Argued June 23, 1987.
Decided Feb. 8, 1988.
 
 James B. Weidner, New York City (David A. Schulz, Mark Holland, Peter Kimm, Jr., Roger & Wells, William J. Fitzpatrick, New York City, Donald J. Crawford, Washington, D.C., of counsel), for petitioner-cross-respondent Securities Industry Ass'n.
 Michael S. Helfer, Washington, D.C. (Christopher Lipsett, Thomas P. Olson, Wilmer, Cutler & Pickering, Washington, D.C., of counsel), Pro Hac Vice for intervenor-respondent cross-petitioner Citibank.
 Lewis B. Kaden, New York City (Lowell Gordon Harriss, D. Scott Wise, Davis Polk & Wardwell, New York, New York, of counsel), for intervenor-respondent cross-petitioner J.P. Morgan & Co. Inc.
 Richard M. Ashton, Washington, D.C., (Richard K. Willard, Asst. Atty. Gen., U.S. Dept. of Justice, Michael Bradfield, General Counsel, Kay E. Bondehagen, Douglas B. Jordan, Washington, D.C., Robert M. Kimmitt, Department of the Treasury, Richard V. Fitzgerald, Office of the Comptroller of the Currency, Washington, D.C., of counsel), for respondents Bd. of Governors of the Federal Reserve System, et al.
 Davis Polk & Wardwell, New York City, of counsel, for J.P. Morgan & Co., Inc.
 White & Case, New York City, of counsel, for Bankers Trust New York Corp.
 Shearman & Sterling, New York City, and Wilmer, Cutler & Pickering, Washington, D.C., of counsel, for Citicorp.
 Cravath, Swaine & Moore, New York City, of counsel, for Chemical New York Corp.
 Milbank, Tweed, Hadley & McCloy, New York City, of counsel, for The Chase Manhattan Corp.
 Simpson Thacher & Bartlett, New York City, of counsel, for Mfrs. Hanover Corp.
 O'Melveny & Myers, New York City, of counsel, for Sec. Pacific Corp.
 Martin Glenn, O'Melveny & Myers, New York City (Russell A. Freeman, Dan C. Aardal, Sec. Pacific Corp., Los Angeles, Cal., Edward J. McAniff, Michael J. Fairclough, O'Melveny & Myers, Los Angeles, Cal., William T. Coleman, Jr., John H. Beisner, Jacob M. Lewis, James P. Nehf, O'Melveny & Myers, Washington, D.C., of counsel), filed a brief on behalf of intervenor-respondent, cross-petitioner Sec. Pacific Corp.
 David M. Miles, Washington, D.C. (Harvey L. Pitt, Henry A. Hubschman, Fried, Frank, Harris, Shriver & Jacobson, Washington, D.C., Matthew P. Fink, Senior Vice President and General Counsel, Sarah O'Neil, Associate General Counsel, Inv. Co. Institute, Washington, D.C., of counsel), filed a brief on behalf of Inv. Co. Institute as amicus curiae.
 Hogan & Hartson, Washington, D.C. (Neal L. Petersen, Keith R. Fisher, James G. Christiansen, Washington, D.C., of counsel), filed a brief on behalf of Bank Capital Markets Ass'n as amicus curiae.
 John J. Gill, General Counsel, Washington, D.C. (Michael F. Crotty, Associate General Counsel-Litigation, American Bankers Ass'n, Washington, D.C., of counsel), filed a brief on behalf of the American Bankers Ass'n as amicus curiae.
 Before CARDAMONE, PIERCE and WINTER, Circuit Judges.
 CARDAMONE, Circuit Judge:
 
 
 1
 We review on this appeal those provisions of the Banking Act of 1933 that separated the commercial and investment banking industries and are known as the Glass-Steagall Act. See Pub.L. No. 73-66, Secs. 16, 20, 21, & 32, 48 Stat. 162 (1933). Demand for divorcing banking and securities activities followed in the wake of the stock market crash of 1929, which occurred, it was said, because a mountain of credit rested on only a molehill of cash. The actions of the Federal Reserve Board that we review today allow commercial and investment banking to compete in a narrow market, and to that extent dismantle the wall of separation installed between them by the Glass-Steagall Act. Whether Santayana's notion that those who will not learn from the past are condemned to repeat it fairly characterizes the consequences of the Board's action is not for us to say. Our task is to review the Glass-Steagall Act, the legislative history that surrounded its enactment, and its prior judicial construction to determine whether the Board reasonably interpreted the Act's often ambiguous terms.
 
 
 2
 The Securities Industry Association (SIA) and seven bank holding companies petition for review of six related orders of the Board of Governors of the Federal Reserve System (Board). The orders approved the bank holding companies' applications to utilize subsidiaries as the vehicle by which they can underwrite and deal in certain securities. The Board determined that the approved activities would not run afoul of Sec. 20 of the Glass-Steagall Act, which proscribes affiliations of banks--here, the holding companies' member bank subsidiaries--with entities that are "engaged principally" in underwriting and dealing in securities. At the same time, the Board limited the scope of the approved activities. The decisions allowing bank subsidiaries to engage in securities transactions and the limitations that were imposed are the focus of the petitions seeking review. For the reasons set forth below, we deny the petitions for review save for the bank holding companies' cross-petition for review that seeks to eliminate the market share limitation.
 
 BACKGROUND
 I The Board's Orders
 
 3
 On April 30, 1987 the Board approved the applications of Citicorp, J.P. Morgan & Co., Inc., and Bankers Trust New York Corp. to engage in limited securities activities through wholly-owned subsidiaries. 73 Fed.Reserve Bull. 473 (1987). At the time of the applications, the subsidiaries were engaged entirely in underwriting and dealing in U.S. government and agency securities and those of state and municipal governments. The holding companies sought to extend their subsidiaries' activities to underwriting and dealing in municipal revenue bonds, mortgage related securities, consumer receivables related securities, and commercial paper.[1] With the exception of the consumer receivables, on which decision was deferred because of an insufficient record, the Board approved the applications by a vote of three to two. Limitations on the scope of the activities more restrictive than those initially proposed by the holding companies--to be discussed more fully below--were imposed.
 
 
 4
 On May 18, 1987 the Board approved the applications of four other bank holding companies, Chase Manhattan Corp., Chemical New York Corp., Manufacturers Hanover Corp., and Security Pacific Corp., to underwrite and deal in the same activities to the same extent approved in its April 30th order. 73 Fed.Reserve Bull. 607 (1987); id. at 616; id. at 620; id. at 622. With the exception of Chase Manhattan, each holding company then had an existing subsidiary currently engaged in underwriting and dealing in federal, state, and local government securities. Chase Manhattan's application included a request for its subsidiary to engage in government securities activities, which the Board approved. The Board also approved Citicorp's supplemental application to deal in commercial paper. Id. at 618.
 
 
 5
 SIA, a trade association representing securities brokers, dealers, and underwriters, petitioned for review of the April 30th and May 18th orders, arguing that the approved activities would violate Sec. 20 of the Glass-Steagall Act. The holding companies cross-petitioned challenging the Board imposed limitations. We granted a stay of the orders on May 19, 1987 pending this expedited appeal.
 
 II The Board's Analysis
 
 6
 The bank holding companies' applications were made pursuant to Sec. 4(c)(8) of the Bank Holding Company Act of 1956, which allows a bank holding company to acquire the "shares of any company the activities of which the Board ... has determined ... to be so closely related to banking ... as to be a proper incident thereto." 12 U.S.C. Sec. 1843(c)(8) (1982). The determination that the approved securities activities are closely related to banking is not contested on this appeal. Rather, since the Board's discretion under Sec. 4(c)(8) is limited by the Glass-Steagall Act, cf. Board of Governors of Fed. Reserve Sys. v. Investment Co. Inst., 450 U.S. 46, 76-77, 101 S.Ct. 973, 992, 67 L.Ed.2d 36 (1981) (ICI ), the principal issue before the Board was whether the approval of the activities would contravene that Act.
 
 
 7
 Section 20 of the Glass-Steagall Act forbids a member bank of the Federal Reserve System from affiliating with an organization "engaged principally" in, inter alia, underwriting or dealing in securities. 12 U.S.C. Sec. 377 (1982). Bank holding companies have been allowed since 1978--without a court challenge by SIA--to acquire or form subsidiaries that underwrite and deal in securities representing obligations of the United States and of states and their political subdivisions. See, e.g., United Bancorp, 64 Fed.Reserve Bull. 222 (1978); see also 12 C.F.R. Sec. 225.25(b)(16) (1987) (regulation permitting such activity). Section 16 of the Glass-Steagall Act expressly permits banks themselves to underwrite and deal in these governmental securities, known as "bank-eligible securities." 12 U.S.C. Sec. 24 (Seventh) (1982 & Supp. IV 1986).
 
 
 8
 Given the authorization in Sec. 16 for banks to engage in bank-eligible securities activities, the Board concluded that Congress did not aim in Sec. 20 to proscribe bank affiliates from engaging in the same activities. 73 Fed.Reserve Bull. at 478-81. It reasoned that it would be anomalous not to permit the bank's subsidiary to engage in the activities lawfully permitted the bank. That illogical result necessarily follows if bank-eligible securities are defined as "securities" under Sec. 20 because that section prohibits a member bank from being affiliated with an organization "engaged principally" in securities dealing. Hence, according to the Board, "securities" cannot logically mean bank-eligible securities. "Securities" in Sec. 20 must therefore only refer to those types of securities that under Sec. 16 banks cannot themselves deal in or underwrite, known as "bank-ineligible securities." The activities approved in the orders at issue on this appeal--underwriting and dealing in municipal revenue bonds, mortgage related securities, and commercial paper--cannot be conducted by a member bank and are therefore bank-ineligible securities activities.
 
 
 9
 Establishing as a predicate that the proscription in Sec. 20 extends only to bank-ineligible securities, the Board turned to the question of when an affiliate is "engaged principally" in such activity. Relying on its order in Bankers Trust New York Corp., 73 Fed.Reserve Bull. 138 (1987),[2] the Board held that the term "engaged principally" means any substantial activity. 73 Fed.Reserve Bull. at 482. It then concluded that subsidiaries would not be engaged substantially in bank-ineligible activities if no more than five to ten percent of their total gross revenues was derived from such activities over a two-year period, and if the activities in connection with each type of bank-ineligible security did not constitute more than five to ten percent of the market for that particular security. Id. at 485-86. The Board then proceeded to approve gross revenue and market share levels at five percent--the low end of the acceptable range--but stated that it would review the five percent limitations within a year after the implementation of its orders. The applicants wanted, of course, to engage in higher levels of activity.
 
 
 10
 On review, SIA argues that the Board erroneously construed the Glass-Steagall Act by construing the word "securities" in Sec. 20 not to include bank-eligible securities. In other words, SIA contends that Sec. 20 limits both bank-eligible and bank-ineligible security activities by a member bank affiliate. SIA also objects to the Board's construction of "engaged principally." The bank holding companies urge us to adopt the Board's construction of Sec. 20 with regard to "securities", but argue, at the same time, that the Glass-Steagall Act mandates that the Board allow a higher level of bank-ineligible activity than that approved.
 
 THRESHOLD MATTERS
 I The Moratorium
 
 11
 Subsequent to the stay granted in this case, Congress enacted and the President signed into law on August 10, 1987 the Competitive Equality Banking Act of 1987, Pub.L. No. 100-86, 101 Stat. 552 (CEBA),[3] the provisions of which impose a moratorium period, effective retroactively, prohibiting the Board from approving affiliate involvement in certain securities transactions. Section 201(b) provides that between March 6, 1987 and March 1, 1988,
 
 
 12
 (2) A Federal banking agency may not authorize or allow by action, inaction, or otherwise any bank holding company or subsidiary or affiliate thereof ... to engage in the United States to any extent whatever--
 
 
 13
 (A) in the flotation, underwriting, public sale, dealing in, or distribution of securities if that approval would require the agency to determine that the entity which would conduct such activities would not be engaged principally in such activities....
 
 
 14
 CEBA, Sec. 201(b), 101 Stat. at 582 (to be codified at 12 U.S.C. Sec. 1841 note).
 
 
 15
 Under Sec. 202 the Board may issue an order during the moratorium period pursuant to its authority in existence before CEBA "if the effective date of such ... order is delayed until the expiration of such moratorium." 101 Stat. at 584 (to be codified at 12 U.S.C. Sec. 1841 note). According to the Joint Explanatory Statement of the Conference Committee to fall within this exception an order "must contain or otherwise be subject to" a specification "that the powers in question may not be exercised before the moratorium has expired." H.R.Conf.Rep. No. 261, 100th Cong., 1st Sess. 149 (1987), reprinted in 1987 U.S.Code Cong. & Admin.News 588, 618.
 
 
 16
 Each order subject to our review was issued during the moratorium period and each approved of activities covered by Sec. 201. Nevertheless, the Board noted in its April 30th order that it was aware that Congress might impose the moratorium and that there might be an exception for orders that delay the effective date. 73 Fed.Reserve Bull. at 502. The Board then called to the applicants' attention that subsequent legislation might require them to cease the approved activities in the event of a moratorium and also retained jurisdiction "to act to carry out the requirements of any legislation adopted by Congress" that affected the activities approved under the order. Id. Identical explanations and caveats appear in the other orders relevant to this appeal. Thus, their effective date effectively was delayed in the event of a moratorium, as mandated by Sec. 202. CEBA therefore in no way precludes our review of the substantive issues presented in these petitions. Before considering them, we discuss briefly the applicable standard of review.
 
 II Standard of Review
 
 17
 The starting point for reviewing an agency's construction of a statute is the language of the statute. See, e.g., Federal Deposit Ins. Corp. v. Philadelphia Gear Corp., 476 U.S. 426, 106 S.Ct. 1931, 1934, 90 L.Ed.2d 428 (1986); Board of Governors of the Fed. Reserve Sys. v. Dimension Fin. Corp., 474 U.S. 361, 368, 106 S.Ct. 681, 688, 88 L.Ed.2d 691 (1986); Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984). An agency's construction of unambiguous statutory language is never an issue because the clear language of the statute must be given effect by the agency and the courts. See Chevron, 467 U.S. at 842-43, 104 S.Ct. at 2781-82. ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."). Only when the statutory language is ambiguous must a court inquire whether the agency's construction is permissible. Id. at 843, 104 S.Ct. at 2782. If the Board's interpretation of the Glass-Steagall Act is reasonable its decision must be upheld. See Securities Indus. Ass'n v. Board of Governors of the Fed. Reserve Sys., 716 F.2d 92, 95 (2d Cir.1983) ("Because the Board has both primary responsibility for implementing the Glass-Steagall Act and expert knowledge of commercial banking, we must uphold its interpretation of the Act if it is reasonable."), aff'd, 468 U.S. 207, 104 S.Ct. 3003, 82 L.Ed.2d 158 (1984). Thus, the first question is whether Sec. 20 is ambiguous.
 
 
 18
 The Board readily concedes that the term "securities" in Sec. 20 could be read to include not only those securities that banks are expressly permitted to underwrite or deal in, that is, bank-eligible securities, but also those that banks are not entitled to underwrite or deal in, that is, bank-ineligible securities. Unlike Sec. 16--which expressly distinguishes bank-eligible from bank-ineligible securities--Sec. 20 does not distinguish the terms. Hence, at least on the surface Sec. 20 would appear to refer to both kinds of securities.
 
 
 19
 But a closer examination of Glass-Steagall leads us to reject this conclusion. In the first place, the Act makes three different references to the term "securities." Section 16 distinguishes bank-eligible from bank-ineligible securities. 12 U.S.C. Sec. 24 (Seventh) (1982 & Supp. IV 1986). Repealed Sec. 19(e), discussed infra note 4, referred to "securities of any sort." 48 Stat. at 188 (emphasis added). And Secs. 20 and 32 refer simply to "securities." 12 U.S.C. Sec. 377 (1982) (Sec. 20); 48 Stat. at 194 (codified as amended at 12 U.S.C. Sec. 78 (1982)) (Sec. 32). That Congress chose three distinctively different ways to describe securities raises a red flag that cautions against declaring that the meaning of that term in Sec. 20 is clear.
 
 
 20
 Further support for the proposition that Sec. 20 is uncertain is provided by the subsequent amendment to Sec. 21 of Glass-Steagall. Section 21 originally did not expressly exempt bank-eligible securities as did Sec. 16. A 1935 amendment made it plain that Sec. 21 did not prevent that which Sec. 16 permitted. See Banking Act of 1935, Pub.L. No. 74-305, Sec. 303, 49 Stat. 684, 707. The significance of this to the issue of Sec. 20's ambiguity is that the amendment was only intended to clarify existing law, see, e.g., H.R.Rep. No. 742, 74th Cong., 1st Sess. 16 (1935); S.Rep. No. 1260, 73d Cong., 2d Sess. 2 (1934); Securities Indus. Ass'n v. Board of Governors of the Fed. Reserve Sys., 807 F.2d 1052, 1057-58 (D.C.Cir.1986) (Bankers Trust II ), cert. denied, --- U.S. ----, 107 S.Ct. 3228, 97 L.Ed.2d 734 (1987), and did not purport to effect any substantive change. But, if the 1935 amendment was not intended to alter the substance of Sec. 21, it follows that the Congress that enacted Glass-Steagall did not invariably make an explicit distinction between bank-eligible and bank-ineligible securities, even when it aimed to distinguish them from one another. Based on this, we can conclude with some confidence that Congress' reference in Sec. 20 to "securities" is ambiguous, and undertake to decide whether the Board's interpretation of securities in Sec. 20 is reasonable and therefore entitled to deference.
 
 
 21
 Of course, "deference is not to be a device that emasculates the significance of judicial review." Securities Indus. Ass'n v. Board of Governors of the Fed. Reserve Sys., 468 U.S. 137, 142-43, 104 S.Ct. 2979, 2982, 82 L.Ed.2d 107 (1984) (Bankers Trust I ). One factor militating against deference to the Board's definition of securities is its failure to address an apparent contradiction, discussed below, between its interpretation of Sec. 20 and its prior view of Sec. 32. This failure implicates two factors that courts take into consideration in deciding whether to accord deference to an administrative agency charged with implementing a statute: first, "the thoroughness, validity, and consistency of an agency's reasoning," Federal Election Comm'n v. Democratic Senatorial Campaign Comm., 454 U.S. 27, 37, 102 S.Ct. 38, 44, 70 L.Ed.2d 23 (1981), and, second, the consistency of the agency's present interpretation with its earlier pronouncements, Morton v. Ruiz, 415 U.S. 199, 237, 94 S.Ct. 1055, 1075, 39 L.Ed.2d 270 (1974); Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944).
 
 
 22
 The Board should have examined Sec. 32 in its analysis of Sec. 20 because--as the Supreme Court has indicated--"Secs. 32 and 20 contain identical language, were enacted for similar purposes, and are part of the same statute." Securities Indus. Ass'n v. Board of Governors of the Fed. Reserve Sys., 468 U.S. 207, 219, 104 S.Ct. 3003, 3010, 82 L.Ed.2d 158 (1984) (Schwab ). Thus, an established interpretation of the language of one section is important in interpreting the language of the other. See id. In that respect, the Board's 120-page opinion is deficient.
 
 
 23
 The Board's earlier view of Sec. 32 suggests that bank-eligible securities were included within the term "securities" in Sec. 32. In 1936 the Board exempted from Sec. 32 individuals dealing in or underwriting "bonds, notes, certificates of indebtedness, and Treasury bills of the United States." 22 Fed.Reserve Bull. 51, 52 (1936). As SIA argues, this suggests that the Board understood that bank-eligible securities were covered by Sec. 32, because there was otherwise no need to exempt from Sec. 32 individuals involved in those securities activities. At oral argument the Board's response to SIA's contention was that it had merely failed to explain its reasoning for the exemption, and that granting the exemption from the prohibitions of Sec. 32 was done only for purposes of clarity.
 
 
 24
 This could be a plausible explanation, but in this instance we think it is not. Although in its current form Regulation R does exempt from Sec. 32 individuals engaged in any securities activity permitted to banks under Sec. 16, see 12 C.F.R. Sec. 218.2 (1987), the exemption, as originally enacted, did not exempt all forms of bank-eligible securities, but only the obligations of the United States. Omitted from exemption were the general obligations of the States or their political subdivisions. See 22 Fed.Reserve Bull. at 52. From this it is obvious that the Board did not read Sec. 32 as excluding ab initio all bank-eligible securities, but rather that it exercised the authority granted it by Congress under Sec. 32--authority not granted in Sec. 20--to create a narrow exemption for individuals dealing in United States government obligations. In addition, in a footnote to the 1936 regulation, the Board enumerated instances in which the terms of Sec. 32 did not apply. See 22 Fed.Reserve Bull. at 51 n. 1. Plainly, the Board knew how to say when Sec. 32 did not apply to a certain activity, and how to state that a certain activity was subject to Sec. 32, but was nevertheless exempted pursuant to the Board under its statutory authority.
 
 
 25
 The Board's orders on appeal here are not instances where the Board failed to adopt an expressly articulated position on the meaning of Sec. 20. Cf. Investment Co. Inst. v. Camp, 401 U.S. 617, 627-28, 91 S.Ct. 1091, 1097-98, 28 L.Ed.2d 367 (1971) (Camp ). Nonetheless, its failure to address--in what is an otherwise comprehensive and reasoned decision--the significance of its prior interpretation of Sec. 32 counsels against granting it full deference. Our own review of the history of the Glass-Steagall Act leads us nonetheless to conclude that construing Sec. 20 as not encompassing activities by bank affiliates in bank-eligible securities is essential if Congress' purpose in enacting Sec. 20 is to be effectuated.
 
 DISCUSSION
 
 26
 The two principal issues presented to this court are the Board's constructions of the terms "securities" and "engaged principally" under Sec. 20 of the Glass-Steagall Act. The proper interpretation of Sec. 20 is an issue of first impression and necessitates a comprehensive examination of both the relevant legislation and the events surrounding its enactment.
 
 I Glass-Steagall: A Statutory Overview
 
 27
 The whole of the Banking Act of 1933, ch. 89, Pub.L. No. 73-66, 48 Stat. 162 (1933) (codified as amended in scattered sections of 12 U.S.C.), is sometimes referred to as the Glass-Steagall Act. See ICI, 450 U.S. at 53, 101 S.Ct. at 980. It is perhaps more accurate to consider Secs. 16, 20, 21, and 32 of the Banking Act of 1933 in particular as the Glass-Steagall Act. See Schwab, 468 U.S. at 216 & n. 15, 104 S.Ct. at 3008 & n. 15. These sections, the " 'Maginot Line' of the financial world," see Macey, Special Interest Groups Legislation and the Judicial Function: The Dilemma of Glass-Steagall, 33 Emory L.J. 1, 5 (1984) [hereinafter Glass-Steagall Dilemma ] (quoting Bevis Longstreth, "Current Issues Facing the Securities Industry and the SEC," May 4, 1982 speech to the SIA), were meant to separate commercial and investment banking.[4]
 
 
 28
 Section 16 of the Glass-Steagall Act applies to federally chartered banks and restricts their powers. In pertinent part, the statute as amended provides:
 
 
 29
 The business of dealing in securities and stock by the [member bank] shall be limited to purchasing and selling such securities and stock without recourse, solely upon the order, and for the account of, customers, and in no case for its own account, and the [member bank] shall not underwrite any issue of securities or stock.... The limitations and restrictions herein contained as to dealing in, underwriting and purchasing for its own account, investment securities shall not apply to obligations of the United States, or general obligations of any State or of any political subdivision thereof....
 
 
 30
 12 U.S.C. Sec. 24 (Seventh) (1982 & Supp. IV 1986).
 
 
 31
 As can be readily seen, Sec. 16 forbids national banks from underwriting "any issue of securities or stock"[5] and also limits their ability to deal in securities. As noted, it expressly excepts from its coverage underwriting and dealing in the obligations of the United States or general obligations of states or their political subdivisions, which we have termed "bank-eligible securities."
 
 
 32
 Section 21 seeks to draw the same line as Sec. 16 does for commercial banks, but from the perspective of investment banks. See Bankers Trust I, 468 U.S. at 148, 104 S.Ct. at 2985. Section 21 as amended reads in pertinent part:
 
 
 33
 (a) After the expiration of one year after June 16, 1933, it shall be unlawful--
 
 
 34
 (1) For any person, firm, corporation, association, business trust, or other similar organization, engaged in the business of issuing, underwriting, selling, or distributing, at wholesale or retail, or through syndicate participation, stocks, bonds, debentures, notes, or other securities, to engage at the same time to any extent whatever in the business of receiving deposits subject to check or to repayment upon presentation of a passbook, certificate of deposit, or other evidence of debt, or upon request of the depositor: Provided, That the provisions of this paragraph shall not prohibit national banks or State banks or trust companies (whether or not members of the Federal Reserve System) or other financial institutions or private bankers from dealing in, underwriting, purchasing, and selling investment securities, or issuing securities, to the extent permitted to national banking associations by the provisions of section 24 of this title....
 
 
 35
 12 U.S.C. Sec. 378(a)(1) (1982). Section 21 prohibits firms "engaged " in certain investment banking activities from undertaking commercial banking activities. See Bankers Trust I, 468 U.S. at 148, 104 S.Ct. at 2985; ICI, 450 U.S. at 62-63, 101 S.Ct. at 985. As originally drafted and enacted it did not contain the Sec. 16 proviso that allowed banks to underwrite and deal in bank-eligible securities. See Banking Act of 1933, Sec. 21, 48 Stat. at 189. A 1935 amendment to Sec. 21 made explicit that Sec. 21 did not prohibit those activities permitted member banks under Sec. 16. See Banking Act of 1935, Pub.L. No. 74-305, ch. 614, tit. III, Sec. 303(a), 49 Stat. 684, 707 (1935).
 
 
 36
 Sections 32 and 20 are the Glass-Steagall Act's "remaining ramparts" in the line between commercial and investment banking. Glass-Steagall Dilemma, supra, at 6. Section 32 as amended reads in its entirety:
 
 
 37
 No officer, director, or employee of any corporation or unincorporated association, no partner or employee of any partnership, and no individual, primarily engaged in the issue, flotation, underwriting, public sale, or distribution, at wholesale or retail, or through syndicate participation, of stocks, bonds, or other similar securities, shall serve the same time as an officer, director, or employee of any member bank except in limited classes of cases in which the Board of Governors of the Federal Reserve System may allow such service by general regulations when in the judgment of the said Board it would not unduly influence the investment policies of such member bank or the advice it gives its customers regarding investments.
 
 
 38
 12 U.S.C. Sec. 78 (1982) (emphasis added). Section 32 prohibits personnel "interlocks" between member banks and firms that are "primarily engaged " in the business of underwriting or dealing in securities. In its original form, the section authorized the Board to permit an individual exemption from the prohibitions of Sec. 32. See Banking Act of 1933, Sec. 32, 48 Stat. at 194. In 1935 Congress amended Sec. 32 to allow the Board to promulgate a general regulation to exempt "classes of cases" from the reach of Sec. 32. See Banking Act of 1935, Sec. 307, 49 Stat. at 709. In 1936 the Board promulgated Regulation R, which exempted from Sec. 32 individuals dealing in "bonds, notes, certificates of indebtedness, and Treasury bills of the United States." See 22 Fed.Reserve Bull. 51, 52 (1936). The current version of Regulation R is found at 12 C.F.R. Sec. 218.2 (1987).
 
 
 39
 Finally, Sec. 20--the proper interpretation of which is the principal question presented on this appeal--provides in pertinent part:
 
 
 40
 After one year from June 16, 1933, no member bank shall be affiliated in any manner described in subsection (b) of section 221a of this title with any corporation, association, business trust, or other similar organization engaged principally in the issue, flotation, underwriting, public sale, or distribution at wholesale or retail or through syndicate participation of stocks, bonds, debentures, notes, or other securities....
 
 
 41
 12 U.S.C. Sec. 377 (1982) (emphasis added). As discussed above, the Board concluded that Sec. 20 only proscribes member bank affiliation with firms "engaged principally in the issue, flotation, underwriting, public sale, or distribution" of bank-ineligible securities, those which banks are prevented under Sec. 16 from dealing in themselves. Throughout this opinion we have adopted, for clarity's sake, the term "underwriting and dealing in" to refer to "the issue, flotation ..." language in Sec. 20.
 
 II The Meaning of "Securities" in Sec. 20
 
 42
 When called upon to interpret the Glass-Steagall Act, judges "face a virtually insurmountable burden due to the vast dichotomy between the ostensible legislative intent and the actual motivations of Congress." Glass-Steagall Dilemma, supra, at 1-2. Divining the aim of Congress in enacting Sec. 20 is particularly formidable because the issue of the proper relationship between commercial banks and their affiliates caused considerable disagreement among legislators and experts who participated in the development of what became the Banking Act of 1933. See generally Perkins, The Divorce of Commercial and Investment Banking: A History, 88 Banking L.J. 483, 505-12 (1971) [hereinafter Banking Divorce ]. Consequently, we approach the subject first by examining the legislative history of Sec. 20, analyzing the Congressional compromise that resulted in the enactment of Sec. 20, and then by looking at prior judicial construction of the Act.
 
 A. Legislative History
 1. Envisioning Sec. 20--Congress' Purpose
 
 43
 The Act's legislative history reflects the notion that the underlying cause of the stock market crash in 1929 and subsequent bank insolvencies came about from the excessive use of bank credit to speculate in the stock market. See S.Rep. No. 77, 73d Cong., 1st Sess. 3-9 (1933) [hereinafter 1933 Senate Report ]; see also 75 Cong.Rec. 9883-84 (1932) (remarks of Sen. Glass) (criticizing transformation of the Federal Reserve System from a commercial banking system into one used for "stock-market speculative operations"). Bank affiliates were identified as a major factor in the overextension of credit for security loans. See 1933 Senate Report, supra, at 9-10.
 
 
 44
 Congress' concern was not limited solely to how securities affiliates contributed to the excesses in bank credit; its apprehension was far more fundamental and structural. Senator Bulkley, for example, repeatedly stressed that the debate over affiliates should not obscure "[t]he important and underlying question [of] whether banking institutions receiving commercial and savings deposits ought to be permitted at all to engage in the investment-security business." 75 Cong.Rec. 9910 (1932). He argued that "[t]he existence of security affiliates is a mere incident to this question," id., and reiterated that "the real question is not whether ... banks shall be permitted to have investment-security affiliates but rather whether they should be permitted to engage in the investment-security business in any manner at all, through affiliates or otherwise," id. at 9911.
 
 
 45
 Two large problems attendant upon the involvement of a commercial bank in investment banking--either on its own or through use of an affiliate--were identified by Congress. The first was "the danger of banks using bank assets in imprudent securities investments." ICI, 450 U.S. at 66, 101 S.Ct. at 986-87; see also Camp, 401 U.S. at 630, 91 S.Ct. at 1098. The second "focused on the more subtle hazards that arise when a commercial bank goes beyond the business of acting as fiduciary or managing agent and enters the investment banking business either directly or by establishing an affiliate to hold and sell particular investments." Camp, 401 U.S. at 630, 91 S.Ct. at 1099.
 
 
 46
 In Camp the Supreme Court described these subtle hazards: loss of public confidence in a bank if its affiliate lost money; the temptation for a bank to shore up an affiliate through unsound loans; imprudent lending to companies in which the security affiliate has invested or become interested; possible loss of a bank's goodwill should its depositors suffer losses on investments that they purchased in reliance on the relationship between the bank and its affiliate; bank loans used for purposes of buying securities; commercial bank involvement in investment banking which might facilitate the loss of disinterested investment advice and encourage violations of fiduciary obligations. Camp, 401 U.S. at 631-33, 91 S.Ct. at 1099-1100; see Operation of the National and Federal Reserve Banking Systems, Hearings on S. 71 Before a Subcomm. of the Senate Comm. on Banking and Currency, 71st Cong., 3d Sess. 1063-64 (1931) [hereinafter 1931 Hearings ]; 75 Cong.Rec. 9911-12 (1932) (remarks of Sen. Bulkley).
 
 
 47
 Sections 16 and 21 effectively barred commercial banks from direct engagement in investment banking, with the notable exception of government securities. Yet even before the 1929 crash, direct involvement by a bank had been considered "improper," see Camp, 401 U.S. at 629, 91 S.Ct. at 1098, but bank affiliates had developed as the medium for commercial banks' indirect entry into investment banking, see id. Even though the stock market debacle laid bare the dangers arising from the activities of securities affiliates, opinion was divided on how best to mitigate those dangers.
 
 
 48
 No one argued that the affiliate system had not been abused in the past, see, e.g., 1931 Hearings, supra, at 298-99 (remarks of Charles E. Mitchell, Chairman, National City Bank of New York). Experts believed that an adequate check on such abuse was to establish rigorous examination requirements for affiliates, which had remained largely unregulated before 1929. See, e.g., id. at 117 (testimony of J.H. Case, Chairman, Board of Directors of the Federal Reserve Bank of New York); id. at 192 (testimony of A.H. Wiggin, Chairman of the Governing Board, Chase National Bank); id. at 364 (testimony of O.D. Young, Chairman of the Board, General Electric Co.); id. at 405 (testimony of M.W. Traylor, Chairman of the Board, First National Bank of Chicago). Others thought that if the slate were wiped clean, affiliates should not be legal, but that in 1933 a complete divorce between commercial and investment banking was not feasible given the established role of affiliates in the banking system. See, e.g., id. at 22 (testimony of J. Pole, Comptroller of the Currency); id. at 38-39 (testimony of G.L. Harrison, Governor, Federal Reserve Bank of New York); id. at 148 (testimony of A.C. Miller, Member, Federal Reserve Board).
 
 
 49
 Some advocated complete separation of the commercial and investment banking industries. See, e.g., id. at 231 (testimony of B.W. Trafford, Vice Chairman, First National Bank of Boston). Senator Glass--an adherent of this view--was of the opinion that a "complete separation" was both warranted and capable of being accomplished. E.g., Operation of the National and Federal Reserve Banking Systems, Hearings on S.4115 Before the Senate Comm. on Banking and Currency, 72d Cong., 1st Sess. 42, 267 (1932) (remarks of Sen. Glass) [hereinafter 1932 Hearings ]. Senator Glass' views are significant, of course, because of his role in drafting and shaping the Banking Act of 1933, a portion of which bears his name. Cf. North Haven Bd. of Educ. v. Bell, 456 U.S. 512, 526-27, 102 S.Ct. 1912, 1920-21, 72 L.Ed.2d 299 (1982) (remarks of sponsor of language ultimately enacted "are an authoritative guide to the statute's construction"). Yet, despite the Senator's goal of complete separation, the Senate took a less drastic step. Acknowledging that "[i]t has been suggested ... that the affiliate system be simply 'abolished,' " the Senate rejected this as impossible and stated that its goals toward regulating affiliates were to (1) separate "as far as possible " member banks from affiliates of all kinds; (2) limit advances or loans from parent to affiliate; and (3) install satisfactory examination requirements for affiliates. 1933 Senate Report, supra, at 10 (emphasis added).
 
 2. Construing Sec. 20--Congress' Compromise
 
 50
 Section 20 was Congress' solution to the problem of affiliates and establishes the boundary separating banks from their security affiliates. While Sec. 21 prohibits firms "engaged" in investment banking activities from accepting deposits, Sec. 20 prohibits commercial bank affiliation with firms "engaged principally" in underwriting and dealing in securities. The inference following from this different terminology is obvious: Sec. 20 applies a "less stringent standard" than the absolute bar between commercial and investment banking laid down by Secs. 16 and 21. ICI, 450 U.S. at 60 n. 26, 101 S.Ct. at 283-84 n. 26. Nor can the difference in terminology be attributed to oversight. Section 21 originally contained the term "engaged principally." In offering the amendment that deleted "principally," Senator Bulkley argued that "[i]t has become apparent that at least some of the great investment houses are engaged in so many forms of business that there is some doubt as to whether the investment business is the principal one." 77 Cong.Rec. 4180 (1933). Given that one of the leading advocates of Glass-Steagall recognized that "engaged" connoted a stricter standard than "engaged principally," it is inconceivable that the latter term could remain in Sec. 20 by sheer happenstance. Thus, while the original impetus behind the Glass-Steagall bill on the floor of Congress may have been to sever completely the commercial and investment banking industries, it fell short of that goal--a victim of legislative compromise.
 
 
 51
 Legislative history also supports the view that Sec. 20's use of the word "securities" did not imply a complete separation between commercial and investment banking. A colloquy between Senators Glass and Long is illuminating:
 
 
 52
 MR. LONG. I have been told that the Senator has said that he did not think this bill would prohibit the handling of Government and State bonds by the Federal reserve banks, that the Senator's provision against affiliates handling bonds was not intended to affect the handling of Government and State bonds.
 
 
 53
 MR. GLASS. They are expressly excluded from the terms of the bill.
 
 
 54
 MR. LONG. As to both affiliates and the banks?
 
 
 55
 MR. GLASS. As to affiliates? We are trying to abolish the affiliates in a period of years.
 
 
 56
 MR. LONG. The Senator has no objection, has he, to an affiliate handling them if they handle nothing but the Government and State Bonds under supervision, the same supervision the banks are given?
 
 
 57
 MR. GLASS. I am objecting to affiliates altogether. I am objecting to a national banking institution setting up a back-door arrangement by which it may engage in a business which the national bank act denies it the privilege of doing. If investment banking is a profitable business, who does not know that such business will be set up as a separate institution, not using the money and prestige and facilities of a national bank and its deposits to engage in investment activities? I want to make it impossible hereafter to have the portfolios of commercial banks filled with useless speculative securities, so that when stringency comes upon the country these banks may not respond to the requirements of commerce. That is what is the matter with the country to-day, and it is because this bill would avert a repetition of that disaster that intense and bitter opposition has been organized against it.
 
 
 58
 76 Cong.Rec. 2000 (1933). Senator Glass' aspiration to divorce completely commercial banks from their security affiliates was never attained: Sec. 20 only prohibits affiliation with firms that are "engaged principally" in forbidden investment activity. SIA urges from the above colloquy that Senator Glass objected to affiliates' handling even securities that banks themselves could underwrite under the proposed legislation and that the Senator's view carried the day in Sec. 20 as enacted. On the contrary, we believe Senator Glass' response to Senator Long indicates that he was primarily concerned with "back-door" arrangements between banks and their security affiliates that permitted affiliates to engage in the securities business denied by law to the bank itself. Senator Glass' reservation did not encompass affiliate activity in a business that Sec. 16 grants to a bank "the privilege of doing."
 
 
 59
 Further, Senator Long's initial query indicates that the issue of whether affiliates ought to be able to engage in bank-eligible activities to the same extent as banks themselves was not dormant during the debates. Thus, Senator Long commented that those who had opposed some provisions in the bill "have seen some virtue in it. I particularly refer to the divorcing of the affiliates, except in so far as they handle municipal and Government bonds and securities." 76 Cong.Rec. 2274 (1933). To make certain affiliates had the same right to deal in government obligations, Senator Long had printed and circulated an amendment to the Glass-Steagall bill to that effect. Proposed Amend. to S. 4412, 72d Cong., 2d Sess. (Jan. 10, 1933). Despite Senator Long's repeated insistence that Sec. 20 would not preclude bank-eligible activities by an affiliate, this amendment was never formally raised in debate. The Banking Act of 1933 became law five months later, on June 16, 1933, and it can be plausibly urged that the bill finally agreed upon and enacted into law made his amendment unnecessary. Recognizing the power of Senator Long's position, SIA argues that statements and actions taken during debate are not entitled to much weight. See, e.g., Ernst & Ernst v. Hochfelder, 425 U.S. 185, 203 n. 24, 96 S.Ct. 1375, 1386 n. 24, 47 L.Ed.2d 668 (1976). A look at subsequent events in this case illustrates the soundness of that rule. In 1935, just two years after his strong rhetoric in the Banking Act debate, Senator Glass himself supported a proposed amendment to that law granting to commercial banks the right to underwrite securities. 79 Cong.Rec. 11,827 (1935). So much for not having "the portfolios of commercial banks filled with useless securities."
 
 
 60
 Thus, it seems eminently reasonable to conclude from Senator Glass' response to Senator Long, as well as other evidence in the legislative history, that Congress' concern was primarily with bank affiliate activities in bank-ineligible securities. Bank affiliates often "devote[d] themselves ... to perilous underwriting operations, stock speculation, and maintaining a market for the banks' own stock often largely with the resources of the parent bank." 1933 Senate Report, supra, at 10. According to Senator Glass, "[w]hat the committee had foremost in its thought was to exclude from commercial banking all investment securities except those of an undoubted character that would be surely liquidated; and for that reason we made an exception [in Sec. 16] of United States securities and of the general liabilities of States and subdivisions of States." 76 Cong.Rec. 2092 (1933). Given that Glass-Steagall was a means to sever commercial banking only from more speculative, "perilous" investment activities, in which bank-eligible activities were not included, an interpretation of "securities" in Sec. 20 that excludes bank-eligible securities from its reach is entirely consistent with Congress' aim.
 
 
 61
 The history of security affiliates in the United States also supports this view. Many banks formed security affiliates in order to handle the sale of government bonds used to finance World War I. B. Klebaner, Commercial Banking in the United States: A History 109-10 (1974); Banking Divorce, supra, at 490-91; see also 1932 Hearings, supra, at 29 (testimony of A.M. Pope, President, Investment Bankers' Ass'n of Am.). Banks were "expected" to aid the government in distributing war loans and were "encouraged" to aid potential investors by lending them the purchase price of government bonds. Banking Divorce, supra, at 491. It was not until the 1920's that affiliates began to expand into private debt and equity securities activities in response to the demands of the public and business. See id. at 493-96; see also 77 Cong.Rec. 3835 (1933) (remarks of Rep. Steagall) ("Our great banking system was diverted from its original purposes into investment activities, and its service devoted to speculation and international high finance."); 75 Cong.Rec. 9904-05 (1932) (remarks of Sen. Walcott) (businesses began to finance their requirements by sale of securities rather than by borrowing; growth of affiliates was "the outgrowth of the willingness of public to buy readily and without very much inquiry"). It was not the affiliate system as a concept that worried Congress, but the affiliate system as it had developed. The evil that Congress intended to attack was bank involvement in speculative securities, that is, bank-ineligible securities. We cannot attribute to Congress a purpose to limit all securities activities when it consistently made clear that it was only concerned with one type.
 
 
 62
 An elucidation of SIA's suggested interpretation of Sec. 20 shows the anomalies that an over-literal interpretation of the term "securities" in that section might bring. If bank-eligible securities are included in the prohibitions of Sec. 20, an affiliate could "engage" (but not principally) in bank-ineligible securities activities. Alternatively, the same affiliate could engage to the identical extent in bank-eligible securities activities. SIA's construction would permit either, or both, types of activity--up to a certain point. Two banks could each have an affiliate, one engaged in underwriting and dealing in high-risk securities prohibited to banks, and the other engaged in the government obligations that Congress felt to be of such negligible risk that it allowed, and encouraged, banks themselves to deal in them. It is paradoxical to presume that it was Congress' purpose to place both affiliates on the same footing.
 
 
 63
 A subsequent amendment to the Glass-Steagall Act also argues against too strict a construction of Sec. 20. As mentioned earlier, Congress amended Sec. 21 in 1935 to "make it clear that [Sec. 21] does not prohibit any financial institution or private banker from engaging in the securities business" to the extent permitted in Sec. 16. H.R.Rep. No. 742, 74th Cong., 1st Sess. 16 (1935); see also S.Rep. No. 1007, 74th Cong., 1st Sess. 15 (1935); S.Rep. No. 1260, 73d Cong., 2d Sess. 2 (1934). SIA claims that because Sec. 20 was also amended at the same time, see H.R.Rep. No. 742, 74th Cong., 1st Sess. 16 (1935) (amendment to Sec. 20 regarding formalities of affiliate liquidation), the failure to add to Sec. 20 a similar proviso indicates a deliberate legislative determination that Sec. 16 activities are within the scope of Sec. 20. We cannot agree.
 
 
 64
 First, this argument belies the clarifying nature of the amendment to Sec. 21. See Bankers Trust II, 807 F.2d at 1057-58. Second, we decline to hold that in failing to amend Sec. 20 in the same manner Congress planned to clarify the meaning of the term "securities" by its silence. There is evidence that the Banking Act of 1933 itself was not the driving force that caused banks to divest themselves of their affiliates. Instead, economic conditions and Congress' investigation into stock market practices were instrumental in bringing banks to divorce themselves voluntarily from their affiliates. See B. Klebaner, supra, at 140; Banking Divorce, supra, at 522-24. Given this voluntary divestiture, Sec. 20 became much less of a controversy in practice than it had been in legislative debate. Viewed in that perspective, it is not so unusual that Congress failed to amend Sec. 20 in order to "clarify" the intent of that section as it had with Sec. 21.
 
 
 65
 Finally, amicus Investment Company Institute (ICI) argues that repealed Sec. 19(e)'s definition of securities--"securities of any sort"--confirms that "securities" in Sec. 20 must mean both bank-eligible and bank-ineligible securities. To the contrary, "securities of any sort" is just as ambiguous as the word "securities" standing alone, and the phrase is vulnerable to the same construction as that advanced for Sec. 20.
 
 
 66
 Thus, the legislative history strongly supports the view that "securities" in Sec. 20 only refers to bank-ineligible securities.
 
 B. Prior Judicial Construction
 
 67
 The compromise aspect of Sec. 20 exposes the difficulties of fitting this case comfortably within the traditional "subtle hazards" analysis developed in Camp and used by the Supreme Court in subsequent Glass-Steagall Act cases. Under this analysis, the Court noted the hazards that Congress sought to prevent when the Act was passed and then examined whether a particular activity would implicate them. See Schwab, 468 U.S. at 220-21, 104 S.Ct. at 3010-11; Bankers Trust I, 468 U.S. at 154-60, 104 S.Ct. at 2988-2990; ICI, 450 U.S. at 66-68, 101 S.Ct. at 986-88; Camp, 401 U.S. at 630-34, 91 S.Ct. at 1098-1100. By using in Sec. 20 the language "engaged principally" rather than a more restrictive term, Congress expressed a legislative choice to tolerate at least some of those hazards. This situation is not entirely inconsistent with subtle hazards analysis--which never controlled the result in a Glass-Steagall case but only reinforced a conclusion already reached as a matter of statutory interpretation. See Bankers Trust II, 807 F.2d at 1069. Nor, for that matter, has the existence of one hazard required reversal of the Board: a hazard need not "be 'totally obliterated' to permit a banking practice--avoidance of the hazard 'to a large extent' suffices." Id. (quoting ICI, 450 U.S. at 67 n. 39, 101 S.Ct. at 987 n. 39).
 
 
 68
 Accordingly, in reviewing the Board's determination that Sec. 20 does not encompass bank-eligible securities, we give due regard not only to the hazards inherent in affiliation, but also to the manner in which Congress ultimately addressed those hazards through Sec. 20. See Commissioner v. Engle, 464 U.S. 206, 217, 104 S.Ct. 597, 604, 78 L.Ed.2d 420 (1984); Southeastern Community College v. Davis, 442 U.S. 397, 411, 99 S.Ct. 2361, 2369, 60 L.Ed.2d 980 (1979). As the Supreme Court stated in Board of Governors of the Federal Reserve System v. Dimension Financial Corp., 474 U.S. 361, 106 S.Ct. 681, 88 L.Ed.2d 691 (1986):
 
 
 69
 Application of "broad purposes" of legislation at the expense of specific provisions ignores the complexity of the problems Congress is called upon to address and the dynamics of legislative action. Congress may be unanimous in its intent to stamp out some vague social or economic evil; however, because its Members may differ sharply on the means for effectuating that intent, the final language of the legislation may reflect hard-fought compromises. Invocation of the "plain purpose" of legislation at the expense of the terms of the statute itself takes no account of the processes of compromise and, in the end, prevents the effectuation of congressional intent.
 
 
 70
 474 U.S. at 373-74, 106 S.Ct. at 688.
 
 
 71
 In light of these principles, the Court's subtle hazards analysis does not preclude the Board's construction of Sec. 20. As noted, Congress was not concerned with affiliation per se, but rather with the dangers attendant upon the entry of commercial banks into the investment banking field either directly or indirectly. Yet even after acknowledging these perils, Congress allowed banks to underwrite and deal in bank-eligible securities under Sec. 16, making it plain therefore that it believed the risks were not so great when banks dealt in these securities. As Senator Bulkley stressed, whether or not a bank chooses to engage in these activities itself or through an affiliate is relatively unimportant compared to the question of whether a bank should engage in them at all. Since banks are allowed under Sec. 16 to underwrite and deal in government obligations without limitation, it would be incongruous for Sec. 20 to prohibit banks from affiliating with entities that are merely "engaged principally" in those same activities.
 
 
 72
 Further, the Supreme Court observed that "[i]n both the Glass-Steagall Act itself and in the Bank Holding Company Act, Congress indicated that a bank affiliate may engage in activities that would be impermissible for the bank itself." ICI, 450 U.S. at 64, 101 S.Ct. at 985. Similarly, in Schwab the Court commented that "the fact that Sec. 16 of the Glass-Steagall Act allows banks to engage directly in [a service] suggests that the activity was not the sort that concerned Congress in its effort to secure the Nation's banks from the risks of the securities market." 468 U.S. at 221, 104 S.Ct. at 3011. The same principle necessarily applies here. As we recently stated, "the latitude the Act grants bank holding companies partially to engage in activities such as underwriting, which implicate the Act's policies whether conducted by banks or by bank holding companies, suggests that bank holding companies can, under the Act, be allowed principally to engage in activities which pose the dangers the Act addressed only when conducted by banks." Securities Indus. Ass'n v. Board of Governors of the Fed. Reserve Sys., 716 F.2d 92, 100 (2d Cir.1983), aff'd, Schwab, 468 U.S. 207, 104 S.Ct. 3003, 82 L.Ed.2d 158 (1984). Because underwriting and dealing in government securities pose no hazards to banks themselves, a fortiori bank affiliates should be able principally to engage in the same activity.
 
 
 73
 In sum, the Board's construction of Glass-Steagall is not only reasonable, but dictated by a thorough examination of the legislative history of Glass-Steagall and of the hazards that Congress sought to prevent when enacting Sec. 20. We hold that it was not Congress' purpose in Sec. 20 to preclude a bank affiliate from engaging in the same activities to the same extent as a member bank and we uphold the Board's determination that the reference in Sec. 20 to "securities" does not encompass those securities which Sec. 16 allows banks themselves to underwrite.
 
 
 74
 III "Engaged Principally"
 
 
 75
 We now turn to the Board's determination of when a security affiliate is "engaged principally" in activities covered by Sec. 20. In their applications the bank holding companies sought to comply with the "engaged principally" standard of Sec. 20 by proposing limitations on their underwriting and dealing in bank-ineligible securities. J.P. Morgan & Co., for example, proposed that its bank-ineligible securities activities would not exceed during any rolling two-year period 15 percent of its total business. J.P. Morgan & Co. Proposal, 50 Fed.Reg. 41,025 (1985). It proposed a combination of accounting tests to measure its compliance with the 15 percent limitation.[6] The other companies proposed total volume limits of ten to 15 percent of their total business.
 
 
 76
 The Board rejected these proposals. Following the analysis set forth in its Bankers Trust order, 73 Fed.Reserve Bull. 138 (1987), the Board concluded that "engaged principally" in Sec. 20 denotes any "substantial" bank-ineligible activity. See 73 Fed.Reserve Bull. at 482. Measured quantitatively, the Board stated that an affiliate would not be principally or substantially engaged in bank-ineligible activities if: (1) the gross revenue from Sec. 20 activities did not exceed five to ten percent of the affiliate's total gross revenues (gross revenue limitation or gross revenue test); and (2) the affiliate's activities in connection with each particular type of ineligible security did not account for more than five to ten percent of the total amount of that type of security underwritten domestically by all firms (or, with commercial paper, the average amount of dealer-placed commercial paper outstanding) during the previous calendar year (market share limitation or market share test).[7] Applying this measure to the applications before it, the Board selected the lower five percent figure for both gross revenue and market share limitations. It recognized that this was a "conservative approach," but stated that it would review the limitations within one year of the implementation of its orders. 73 Fed.Reserve Bull. at 485.
 
 
 77
 The bank holding companies petition for review of this interpretation of "engaged principally." First, they argue that the Board's view contravenes Supreme Court precedent. Second, they contend that the limitation is inconsistent with the language, structure, and legislative intent of the Glass-Steagall Act. Finally, cross-petitioner Security Pacific Corporation argues that the Board erred in adopting an inflexible percentage test instead of approaching each affiliate's application on a case-by-case basis.
 
 
 78
 The term "engaged principally" is intrinsically ambiguous. As discussed above, we must uphold the Board's interpretation if it is reasonable. Unlike the facts presented on the issue of the scope of Sec. 20, the Board's position here does not contradict its prior interpretations. Accordingly, we defer to the Board's construction of Sec. 20.
 
 A. Agnew
 
 79
 The Board found that "principally" in Sec. 20 means "substantially." The banks urge that in Board of Governors of the Fed. Reserve Sys. v. Agnew, 329 U.S. 441, 67 S.Ct. 411, 91 L.Ed. 408 (1947), the Supreme Court decided that "principally" means something more than substantially, and therefore that the Board's decision conflicts with Agnew.
 
 
 80
 In Agnew the Board issued an order that required the removal of directors of a national bank because of their affiliation with a company which, in the Board's view, was "primarily engaged" in underwriting securities as prohibited by Sec. 32 of the Act. The United States Court of Appeals for the District of Columbia reversed the Board and held that a company is not "primarily engaged" in underwriting unless the activity is its chief or principal activity--one exceeding 50 percent of the company's business. See Agnew, 153 F.2d 785, 790-91 (D.C.Cir.1946). The Court of Appeals rejected the Board's argument that "primarily" in Sec. 32 could mean "substantially" or "importantly."
 
 
 81
 The Supreme Court reversed, holding that "primarily" in Sec. 32 meant "substantially." 329 U.S. at 446, 67 S.Ct. at 414. In support of that conclusion, the Court noted that Congress used three different terms in the Glass-Steagall Act to describe underwriting firms: (1) those merely "engaged " in underwriting (Sec. 21); (2) those "primarily engaged " in underwriting (Sec. 32); and (3) those "engaged principally " in underwriting (Sec. 20). 329 U.S. at 448, 67 S.Ct. at 414. It then concluded that "[t]he inference seems reasonable to us that Congress by the words it chose marked a distinction which we should not obliterate by reading 'primarily' to mean 'principally'." Id. Because the Board has found that a gross income level of ten percent of covered activities will trigger Sec. 32, see Staff Opinion 3-939, 1 Fed.Reserve Reg.Serv. 389 (Dec. 14, 1981), the holding companies argue that "principally" under Sec. 20 mandates approval of a higher level of activity, and that their proposed ten to 15 percent limitations were well within that level.
 
 
 82
 The statements in Agnew regarding the meaning of "principally" are not dispositive in the instant case. For one thing the meaning of Sec. 20 was not before the Supreme Court in that case. See Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 398 (1821). Further, the statements concerning Sec. 20 are not essential to its holding that "primarily" means "substantially." See Kastigar v. United States, 406 U.S. 441, 454-55, 92 S.Ct. 1653, 1661-62, 32 L.Ed.2d 212 (1972). The main focus of the Court's analysis is on definitions of "primary," see 329 U.S. at 446, 67 S.Ct. at 413, and on the perils Congress sought to check by enacting Sec. 32, id. at 447, 67 S.Ct. at 414. In fact, the brief discussion of Sec. 20 is used to demonstrate that "[t]here is other intrinsic evidence in the Banking Act of 1933 to support our conclusion [on the meaning of "primary"]." Id. Hence, we read Agnew as holding only that "primarily engaged" in Sec. 32 means any "substantial activity."
 
 
 83
 B. "Substantially"
 
 
 84
 The Board's construction of "engaged principally" as denoting any substantial activity is reasonable. We do not conclude that because "engaged principally" in Sec. 20 and "primarily engaged" in Sec. 32 both denote "substantial activity" that the two terms are therefore synonymous. Substantiality is an amorphous qualitative concept that has many quantitative definitional manifestations, see The Shorter Oxford English Dictionary 2172 (3d ed. 1973), which vary with the context in which the term is used. Hence, the Agnew dicta that "engaged principally" and "primarily engaged" do not necessarily mean the same thing, see 329 U.S. at 448-49, 67 S.Ct. at 415, is not entirely circumscribed by the Board's interpretation. In fact, the same considerations that compelled the Court in Agnew to conclude that "primarily" in Sec. 32 means "substantially" apply equally--if not more forcefully--here.
 
 
 85
 The Supreme Court in Agnew rejected a reading that "primarily" meant "chief" or "leading" because the concerns that Congress addressed in enacting Sec. 32 do not vanish if the firm's underwriting activities are 49 percent rather than 51 percent. See 329 U.S. at 447, 67 S.Ct. at 414. In both situations, "a bank director interested in the underwriting business may use his influence in the bank to involve it or its customers in securities which his underwriting house has in its portfolio or has committed itself to take." Id. The banks' argument essentially adopts the Court of Appeals holding in Agnew, that is, "principally" means "chief" or "first." But the same reasoning that guided the Supreme Court guides us. The worries envisioned by bank affiliation with securities firms do not disappear simply because the activity is less than 50 percent of a firm's business.
 
 
 86
 An example illuminates how equating "principally" in Sec. 20 with "chief" or "first" begets the dangers foreseen by Congress. Such an interpretation would allow a member bank to become affiliated with any large integrated securities firm. One commentator has pointed out that reading "principally" as "chief" would allow a bank to be affiliated with Merrill Lynch & Co., Inc., one of the nation's largest investment bankers. See Plotkin, What Meaning Does Glass-Steagall Have for Today's Financial World?, 95 Banking L.J. 404, 414-16 (1977). It cannot be supposed that the Congress that enacted Glass-Steagall would have intended that Sec. 20 not prohibit such affiliations. This is not to say that "principally" cannot in some contexts mean "chief" or "first," but rather that in Sec. 20 the term must be given a definition that is both sensible and in harmony with legislative purpose.
 
 
 87
 Moreover, the logic of the holding companies' position is that "principally" in Sec. 20 is a directly quantitative, not a qualitative, term. "Substantially," on the other hand, reflects the qualitative aspects of "principally." When Congress wanted to use a quantitative test in the Banking Act of 1933, it knew how to do it. See Sec. 2(b), (c), 48 Stat. at 162-63 (definition of affiliate); Sec. 13, 48 Stat. at 183 (collateral requirements for loans to affiliates); Sec. 16 (Seventh), 48 Stat. at 185 (limitations on banks' purchase of securities for own account), Sec. 19(b), 48 Stat. at 187 (level of assets for holding company affiliates to be maintained free of any liens); Sec. 19(c), 48 Stat. at 187 (shareholders' liability determination). Because in Sec. 20 Congress departed from a quantitative approach, the argument that a qualitative test should be controlling is all the more compelling.
 
 
 88
 SIA and ICI advance several arguments against the Board's interpretation of "principally." They assert that "engaged principally" in Sec. 20 at least covers any firm "formed for the purpose of" underwriting securities, relying on the Supreme Court's statement in ICI regarding repealed Sec. 19(e) that "[a]ll companies formed for the purpose of issuing or underwriting securities would surely meet the 'engaged principally' test." 450 U.S. at 70 n. 43, 101 S.Ct. at 988-89 n. 43. Concededly, the subsidiaries here were formed for the purpose of engaging in securities activities.
 
 
 89
 Yet, this argument is unpersuasive too. The Court's statement in ICI is dicta and seems to indicate nothing more remarkable than that a company formed for the purpose of underwriting securities most likely would be expected to be engaged principally in that activity. Further, since Sec. 20 does not restrict bank-eligible securities activities, SIA and ICI arguably miss the point. Companies formed for the purpose of dealing in bank-eligible securities would not fall within the prohibitions of Sec. 20.[8]
 
 
 90
 To support their argument, SIA and ICI also rely on former Sec. 19(e) of the Glass-Steagall Act. Section 19(e)--repealed in 1966--indirectly limited bank holding companies' acquisition of subsidiaries "formed for the purpose of, or engaged principally in" prohibited securities activities. 48 Stat. at 188; see also supra note 4. Because Sec. 20 and Sec. 19(e) were intended to accomplish the same result, SIA and ICI argue that we should read the two sections as being coextensive.
 
 
 91
 Even assuming that SIA and ICI are correct, Sec. 19(e) would not have prohibited the activities here approved. It originally was intended to apply to "any affiliate formed for the purpose of, or engaged in" securities activities. See 1932 Hearings, supra, at 13 (text of proposed Sec. 20(e)) (emphasis added). As originally conceived, any securities activity was prohibited under Sec. 19(e). Thus, there are only two situations when the term "formed for the purpose of" had any meaning independent from "engaged in": when a company had been formed for the purpose of engaging in unpermitted activities, but had (1) not yet commenced activities, or (2) ceased the activities, but might possibly resume them. Plainly, the evil that the "formed for the purpose of" standard was designed to avoid was the formation of subsidiaries ready to "engage"--but not yet engaged--in unauthorized securities activities.
 
 
 92
 Congress eventually added the term "principally" to "engaged" in Sec. 19(e), presumably to have Sec. 19(e) correspond with the standard laid down in Sec. 20. We think that the original meaning of the "formed for the purpose of" language in Sec. 19(e) was retained after this amendment to qualify the new and less restrictive standard of "engaged principally." Thus, Sec. 19(e) prevented subsidiaries from either engaging principally in banned activities--which we have held above to be only bank-ineligible activities--or being formed for the purpose of engaging principally in such activities. Even if the proscriptions of Sec. 20 are coextensive with those of former Sec. 19(e), none of the subsidiaries here has been formed for the purpose of engaging principally in bank-ineligible activities. Section 19(e) therefore would not apply.
 
 
 93
 Alternatively, SIA claims that Congress intended that Sec. 20 bar underwriting or dealing activities that constitute a "regular" or "integral" part of the affiliate's business, as opposed to "incidental" or "occasional" activities. The activities that concerned Congress did not necessarily arise only with the frequency of their repetition. In any event, the Board's interpretation of "principally" as any "substantial" activity adequately addresses any apprehension arising from the frequency or integral nature of an activity.
 
 
 94
 The final argument raised by SIA is that because the Board's interpretation of "engaged principally" necessitates regulation, it a fortiori contravenes the Glass-Steagall Act. It is true that "Congress rejected a regulatory approach when it drafted the statute." Bankers Trust I, 468 U.S. at 153, 104 S.Ct. at 2988. The Board's interpretation is one that attempts to walk the line that Congress laid down. The mere necessity of "regulation" in carrying out Glass-Steagall's "prohibitions" is insufficient to justify rejection of an otherwise reasonable interpretation of the Act. Cf. Bankers Trust II, 807 F.2d at 1067 ("The Glass-Steagall Act does impose a system of flat 'prohibitions' and 'prophylactic' measures, but this cannot obviate the need to examine particular factual situations to determine on which side of the prohibitory line they fall.").
 
 
 95
 Consequently, the Board's view of "engaged principally" as meaning any substantial activity is reasonable and consistent with Congressional purpose.
 
 C. Gross Revenue Limitation
 
 96
 The Board determined that substantial activity, measured quantitatively, constituted five to ten percent of an affiliate's gross revenues over a two-year period. 73 Fed.Reserve Bull. at 485. It set the approved level of activity at the five percent end of this range, but stated its intent to review this level within a year after the order's effective date. Id.
 
 
 97
 One troublesome facet of the Board's ruling is that "engaged principally" in Sec. 20 is equally restrictive as--if not more restrictive than--"primarily engaged" in Sec. 32. The Board has stated that if a firm's prohibited activities constitute less than ten percent of its gross business, see Staff Opinion 3-939, 1 Fed.Reserve Reg.Serv. 389 (Dec. 14, 1981), or amount to less than ten million dollars regardless of the percentage figure, see Board Letter 3-896, 1 Fed.Reserve Reg.Serv. 367 (May 22, 1959), the firm is not "primarily engaged" in such activities under Sec. 32. By placing the permissible level of Sec. 20 activity currently at only five percent of gross revenues--and never more than ten percent--the Board is employing, at least for the present, a more restrictive gross revenue test for Sec. 20 than for Sec. 32.
 
 
 98
 This initially seems to contradict the Supreme Court's indication that Secs. 32 and 20 should be interpreted consistently. See Schwab, 468 U.S. at 219, 104 S.Ct. at 3010 (the term "public sale" should be interpreted consistently because "Secs. 32 and 20 contain identical language, were enacted for similar purposes, and are part of the same statute."). But with regard to "engaged principally" versus "primarily engaged," Secs. 20 and 32 differ; accordingly, there is justification for interpreting them slightly differently.
 
 
 99
 The legislative history also supports the conclusion that the Board's stringent quantitative interpretation of Sec. 20 is reasonable. What became Sec. 20 was proposed by Eugene Meyer, a governor of the Federal Reserve Board, as a substitute for the section which eventually became Sec. 32, see 1932 Hearings, supra, at 387-88, because he believed that the language in the predecessor to Sec. 32--in relevant respects identical to Sec. 32--was overbroad and that it would therefore be ineffectual. See id. at 387. Meyer commented on the "difficulties in the way of accomplishing a complete divorce of member banks from their affiliates arising from the fact that a law intended for that purpose is likely to be susceptible of evasion or else to apply to many cases to which it is not intended to apply," id. at 388, and tentatively suggested substituting what is now Sec. 20 for what is now Sec. 32. It defies logic that Sec. 20 should be interpreted less restrictively than Sec. 32, based on Meyer's comments that Sec. 20 was intended to be more restrictive than Sec. 32.
 
 
 100
 Further support for a stricter interpretation of Sec. 20 than of Sec. 32 is derived from the fact that the dangers resulting from affiliation are arguably greater than those resulting only from personnel interlocks. The public associates a member bank and its affiliate because of their common ownership and often similar names. The potential for the public to associate the misfortunes of the affiliate with the bank is far greater than the association of firms with personnel interlocks, which are generally unknown to the public.
 
 
 101
 Given these considerations, we defer to the Board's determination that Sec. 20 allows an affiliate to engage in bank-ineligible securities activities so long as those activities do not exceed five to ten percent of the affiliate's gross revenue. This range is both reasonable and consistent with the statute. Because of the Board's expertise we also defer to its decision to set the gross revenue limitation at five percent.
 
 D. Market Share Limitation
 
 102
 The Board's second limitation on the subsidiaries' bank-ineligible securities activities provides that the subsidiaries' involvement in each activity may not exceed a five percent share of the total market for that activity. It reasoned that it has employed a market share limitation in determining whether a firm is "primarily engaged" in securities activities within the meaning of Sec. 32. 73 Fed.Reserve Bull. at 484. The Board stated that "the fact that an affiliate would be a major force in a particular securities market would be an evidentiary factor suggesting that the affiliate is 'engaged principally' in underwriting securities." Id. It also concluded that a sales volume test--currently employed under its interpretation of Sec. 32--would be subject to manipulation and that a market share test "would provide a useful and objective proxy for sales volume." Id. It was concerned that sales volume could be easily inflated by use of repurchase and reverse repurchase agreements for government securities--a common practice among government securities dealers--or by "churning." Id.
 
 
 103
 The bank holding companies argue that neither Sec. 20 nor the legislative history of the Glass-Steagall Act provides a basis for the Board's market share test. They assert that Sec. 20 mandates an inquiry only into activities within a subsidiary rather than one into the size of the subsidiary's activity in relation to the market as a whole. A market share test, they claim, is intended sub silentio to promote competition rather than to protect against the hazards of affiliation envisioned by Congress.
 
 
 104
 The Board's justifications for imposing a market share limitation are not persuasive. It cites only two instances in which it has relied on market share data under Sec. 32. One citation is to a 1947 internal letter from the Board to the Federal Reserve Bank of New York. The second citation is to a 1948 letter now included in a compilation of Board interpretations of Regulation R. See Fed.Reserve Reg.Serv. p 3-895 (1948). The 1948 interpretative letter apparently was intended as a guide for future decisions.
 
 
 105
 It is true that Sec. 32 implicitly delegates to the Board the power to determine when a firm is "primarily engaged" in securities activities, in the same way that Sec. 20 implicitly delegates the power to determine when a firm is "engaged principally" in securities activities. Yet Congress chose to grant the Board power to exempt individuals from Sec. 32, but did not grant it similar power in Sec. 20. Since Congress expressly granted the Board different regulatory power in Sec. 32 than in Sec. 20, it does not at all follow that the Board's power to define the meaning of Sec. 20 is coextensive with its power under Sec. 32. Thus, the Board's reliance on Sec. 32 is not dispositive.
 
 
 106
 We discern no support in Sec. 20 for the Board's market share limitation. In the legislative history there is evidence that before the enactment of Glass-Steagall, banks and bank affiliates had acquired an increasingly large share of securities activity in relation to investment banks. See W. Peach, The Security Affiliates of National Banks 108-10 (1941). For example, between 1927 and 1930 the percentage share of commercial banks in origination of bond issues more than doubled. Id. at 109. This increasing market share of commercial banks in traditional investment banking activities was not unknown to Congress. See 1931 Hearings, supra, at 299 (testimony of C.E. Mitchell, Chairman, National City Bank of New York) (presenting data). But, the fact that this was brought to Congress's attention and that Congress did not directly address it is, if anything, a strong indication that Congress was not concerned about market share. Rather, by using the term "engaged principally," Congress indicated that its principal anxiety was over the perceived risk to bank solvency resulting from their over-involvement in securities activity. A market share limitation simply does not further reduce this congressional worry.
 
 
 107
 In addition, the Board has not proven on the record before us that a market share limitation is an objective proxy for a sales volume test. The Board makes no claim that the Act empowers it to limit the power of bank affiliates to compete in the securities markets open to them. Consequently, the banks' cross-petition to eliminate the market share limitation is granted.
 
 E. Security Pacific's Claims
 
 108
 Security Pacific proposed in its application that its subsidiary engage in bank-ineligible securities activities constituting up to 15 percent of the subsidiary's gross revenues. The Board approved a lower level of up to five percent of gross revenues, consistent with its orders approving the other subsidiaries' activities. Security Pacific argues that the Board abused its discretion in setting the lower limitation and by failing to adopt a case-by-case approach to determining appropriate levels of Sec. 20 activity.
 
 
 109
 The gravamen of Security Pacific's argument is that its subsidiary should not be equated with the other bank holding company subsidiaries, all of which are based in New York. Security Pacific is located in California. The New York subsidiaries, Security Pacific argues, will be able to engage in a higher level of bank-eligible activities and, consequently, a higher level of bank-ineligible activities, since bank-ineligible activity levels correspond directly with the total securities activity of the subsidiary. Security Pacific claims that this mandates allowing a higher level of activity for its subsidiary.
 
 
 110
 We disagree. Section 20 must be read to set down at some point a hard and fast limit on the amount of bank-ineligible securities activity, and we have determined that the Board's limit of five to ten percent of the gross revenue is reasonable. Beyond this limit, there is no room for adjustment in order to ameliorate competitive inequality.
 
 
 111
 Within the range set by the Board there is, of course, leeway for adjustments that reflect the competitive positions of certain subsidiaries. Security Pacific declined to submit evidence of special circumstances that might distinguish it from the other affiliates involved and warrant approval of a level of bank-ineligible activity greater than five percent. Given this failure, the Board's approval of a five percent level for Security Pacific was not an abuse of its discretion.
 
 
 112
 Security Pacific also argues that the Board's limitations are inconsistent with Board precedent holding that quantitative measures should be determined on a case-by-case basis. As noted above, Sec. 20 sets down a line that cannot be crossed no matter how exceptional the circumstances, and it cannot be drawn differently in each case.
 
 CONCLUSION
 
 113
 In sum Sec. 20 of the Glass-Steagall Act forbids member bank affiliation with firms that are "engaged principally" in underwriting or dealing in "securities." It was not Congress' plan to forbid affiliates from those activities that banks themselves could engage in without limitation. The Board's interpretation of Sec. 20 under which government securities--those that banks may without limitation underwrite and deal in--are excluded from the prohibition contained in Sec. 20 is therefore consistent with the Congressional scheme. The Board's qualitative and quantitative constructions of the term "engaged principally" are reasonable, with the exception of the market share limitation. Accordingly, we deny the petitions and cross-petitions for review except with respect to the market share limitation.
 
 
 114
 Petitions and cross-petitions for review are denied save for the cross-petition for review that seeks to eliminate the market share limitation, which cross-petition is granted.
 
 
 
 [1]
 J.P. Morgan & Co. did not apply to underwrite or deal in consumer receivables related securities and Citicorp did not propose to engage in activities relating to commercial paper
 
 
 [2]
 Petitions for review of this order are pending in the United States Court of Appeals for the District of Columbia Circuit
 
 
 [3]
 In September the panel wrote to counsel requesting them to advise whether in light of CEBA this appeal remains viable. All counsel promptly responded by early October, 1987 that in their view the appeal was not mooted by the moratorium legislation
 
 
 [4]
 The Glass-Steagall Act originally contained a fifth section--Sec. 19(e)--which also was designed to effect a separation between commercial and investment banking. It read in pertinent part:
 (e) Every such holding company affiliate shall, in its application for such voting permit, (1) show that it does not own, control, or have any interest in, and is not participating in the management or direction of, any corporation, business trust, association, or other similar organization formed for the purpose of, or engaged principally in, the issue, flotation, underwriting, public sale, or distribution, at wholesale or retail or through syndicate participation, of stocks, bonds, debentures, notes, or other securities of any sort (hereinafter referred to as 'securities company'); ...
 Pub.L. No. 73-66, ch. 89, Sec. 19(e), 48 Stat. 162, 188 (1933), repealed, Pub.L. No. 89-485, Sec. 13(c), 80 Stat. 236, 242 (1966).
 Thus, Sec. 19(e) was the Glass-Steagall Act provision that originally dealt with bank holding companies. Section 19(e) operated indirectly; bank holding companies were required to apply to the Reserve Board for a permit entitling them to exercise the voting rights of the shares of stock which they held in member banks. See 48 Stat. at 186. In order to obtain a voting permit, a bank holding company had to divest itself of ownership or control of its securities affiliate(s). The reason for this indirect method was Congress' hesitancy to legislate in regard to state-chartered institutions. See S.Rep. No. 77, 73d Cong., 1st Sess. 10 (1933); 75 Cong.Rec. 9905 (1932) (remarks of Sen. Walcott). Yet, Sec. 19(e) was largely ineffectual because bank holding companies simply elected not to vote the shares of their securities affiliates. See ICI, 450 U.S. at 69-70, 101 S.Ct. at 988-89. In addition, after the enactment of the Bank Holding Company Act of 1956, which broadened the Banking Act's definition of "affiliate," it became doubtful whether Sec. 19(e) was "sufficiently useful to justify [its] retention." S.Rep. No. 1179, 89th Cong., 2d Sess. 12 (1966). The "loophole" therefore was closed by a 1966 amendment. See 80 Stat. at 242.
 
 
 [5]
 As it was originally written, Sec. 16 only prohibited underwriting "securities." See 48 Stat. at 185 (1933). One of the so-called "technical" provisions of the Banking Act of 1935 amended Sec. 16 by adding "and stock" after the references to "securities." Banking Act of 1935, Pub.L. No. 74-305, ch. 614, tit. III, Sec. 308(a), 49 Stat. 684, 709 (1935)
 
 
 [6]
 The limitation would be met if two of the following three tests were satisfied:
 (1) The dollar volume of underwriting commitments [or underwriting sales if larger] and dealer sales attributable to ineligible securities activities with the total dollar volume of all of JPMS's activities;
 (2) The average assets acquired in connection with ineligible securities activities with the average assets acquired in connection with all of JPMS's activities; and
 (3) The gross income [i.e., income before expenses and taxes] from ineligible securities activities with the gross income from all of JPMS's activities.
 
 
 [50]
 Fed.Reg. 41,025 (1985). "JPMS" is a wholly-owned subsidiary of J.P. Morgan Securities Holdings Inc., which is itself wholly-owned by J.P. Morgan & Co. Inc
 
 
 [7]
 The Board was unpersuaded, as we are, that Sec. 20 permits two or more affiliates to combine their total gross incomes for purposes of determining whether or not the affiliates are "engaged principally" in ineligible activity. 73 Fed.Reserve Bull. at 486 n. 45. The reason is plain. The provisions of Sec. 20 apply to each individual company affiliated with a member bank
 
 
 [8]
 SIA and ICI point to testimony that at least one affiliate was formed for the purpose of dealing in bank-ineligible securities. The President of J.P. Morgan & Co. said during the Board hearing that the holding company established its bank-eligible securities subsidiary because it thought that there might be changes in the law allowing dealing in a wider range of securities and that they wanted to have a subsidiary in place when those changes came about. Because we hold that Sec. 20 allows affiliates to engage to a greater extent in securities than the banks themselves, any formation of an affiliate would likely have in part a purpose to engage in those activities prohibited to banks. SIA's argument therefore is also a back-door attempt to have us broaden the scope of Sec. 20 to include bank-ineligible securities, an argument we have rejected