900 F.2d 360
 283 U.S.App.D.C. 376, 58 USLW 2634, Fed.
Sec. L. Rep. P 94,999
 SECURITIES INDUSTRIES ASSOCIATION, Petitioner,
v.
BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM, and Alan
Greenspan, as Chairman of the Board of Governors
of the Federal Reserve System, et al., Respondents,
Bankers Trust New York Corporation, Chase Manhattan
Corporation, Citicorp, Security Pacific
Corporation, J.P. Morgan & Co.,
Incorporated, Intervenors.
 No. 89-1127.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued March 6, 1990.
Decided April 10, 1990.
 
 David A. Schulz, with whom William J. Fitzpatrick, New York City, was on the brief, for petitioner. James B. Weidner, New York City, also entered an appearance for petitioner.
 Richard M. Ashton, Associate Gen. Counsel, Federal Reserve System, with whom Stuart M. Gerson, Asst. Atty. Gen., Dept. of Justice, James V. Mattingly, Jr., Gen. Counsel, and Douglas B. Jordan, Atty., Federal Reserve System, Washington, D.C., were on the brief, for respondents. John R. Bolton, Atty., Dept. of Justice, Washington, D.C., also entered an appearance for respondents.
 Michael S. Helfer, with whom Christopher R. Lipsett and Thomas P. Olson, Washington, D.C., for Citicorp and Chase Manhattan Corp., Paul L. Friedman, Washington, D.C., for Bankers Trust New York Corp., Kenneth L. Bachman, Jr. and Matthew D. Slater, Washington, D.C., for Sec. Pacific Corp., John J. Gill and Michael F. Crotty, Washington, D.C., for American Bankers Ass'n, were on the joint brief for intervenors and amicus curiae, urging dismissal of the petition. Scott W. Muller, Washington, D.C., also entered an appearance for intervenor J.P. Morgan & Co., Inc.
 Before RUTH B. GINSBURG, SILBERMAN and SENTELLE, Circuit Judges.
 PETITION FOR REVIEW OF AN ORDER OF THE BOARD OF GOVERNORS OF
 THE FEDERAL RESERVE SYSTEM
 Opinion for the Court filed by Circuit Judge SILBERMAN.
 SILBERMAN, Circuit Judge:
 
 
 1
 The Securities Industry Association ("SIA"), a national trade association representing securities brokers, dealers, and underwriters, petitions for review of an order of the Board of Governors of the Federal Reserve System (the "Board") authorizing bank affiliates to underwrite and deal in all corporate debt and equity securities, subject to a revenue limitation. We hold that the SIA is barred by the doctrine of issue preclusion (collateral estoppel) from relitigating the Glass-Steagall Act claims it pursued and lost before the Second Circuit, and that the Board reasonably determined that securities underwriting and dealing comport with the requirements of the Bank Holding Company Act of 1956. Accordingly, we deny the petition for review.
 
 I.
 
 2
 The Glass-Steagall Act (the "Act"), the common name for several scattered provisions of the Banking Act of 1933, curtails the securities related activities of commercial banks and their affiliates. Section 16 of the Act, 12 U.S.C. Sec. 24 (Seventh), creates a blanket prohibition against banks from underwriting or dealing in any securities.[1] That provision, however, specifically permits banks to underwrite United States government obligations and state or municipal general obligations--the so-called "bank-eligible" securities. All other securities are considered "bank-ineligible." In contrast to section 16's absolute restrictions on banks, section 20 of the Act, 12 U.S.C. Sec. 377, allows bank affiliates to underwrite or deal in "stocks, bonds, debentures, notes, or other securities," as long as the affiliate is not "engaged principally" in those activities.[2]
 
 
 3
 In 1987 the Board authorized affiliates of three major banks to underwrite and deal in four types of bank-ineligible securities--municipal revenue bonds, mortgage related securities, consumer receivables related securities, and commercial paper--so long as the bank-ineligible securities portion of those affiliates' business was responsible for no more than five to ten percent of their revenue and as long as the affiliates did not gain more than five to ten percent of the market for that underwriting and dealing.[3] The SIA sought review of the Board's order in the Second Circuit. The primary challenge was to the Board's interpretation of the word "securities" in section 20 of the Act. According to the SIA, the Board improperly construed "securities" in that section to mean only bank-ineligible securities. If instead, as the SIA maintained, the word "securities" carried its ordinary meaning and therefore applied to both bank-ineligible and bank-eligible securities, then the Board would have to consider the extent of the affiliate's involvement in all security dealings in determining whether the affiliate was "engaged principally" in those activities.
 
 
 4
 The SIA also challenged the Board's construction of the words "engaged principally." The Board had determined that the phrase meant "substantially"--implying a proportionality concept met by the revenue and market share tests--whereas the SIA contended that bank affiliates were "engaged principally" if the underwriting and dealing constituted a regular or integral portion of their business. The bank holding companies cross-petitioned, contesting the market share test as inappropriate because it did not measure the proportionality of the dealing or underwriting business within the subject firm but rather in the market as a whole.
 
 
 5
 The Second Circuit affirmed most of the Board's decision and order. See SIA v. Board of Governors, 839 F.2d 47 (2d Cir.), cert. denied, 486 U.S. 1059, 108 S.Ct. 2830, 100 L.Ed.2d 931 (1988) ("Citicorp "). The court declined to defer to the Board's interpretation of securities[4], but after making its own independent analysis of the legislative history and statutory structure, it agreed with the Board that Congress never intended the limitation on securities underwriting and dealing by affiliates in section 20 to apply to those securities that a bank itself could underwrite. See id. at 62. On the other hand, the court did defer to the Board's construction of the words "engaged principally" as a reasonable interpretation of the statute. See id. at 64. The market share restriction, however, did not survive review; the court agreed with the banks that that concept was foreign to section 20's concerns. But--and we concede that this step surprises us--the court did not remand the case to the Board to determine whether the revenue test by itself was adequate to determine whether a given affiliate was "engaged principally" in securities activities.[5] Instead, the court simply struck down the market share test leaving only the revenue test in place. See id. at 67-68.
 
 
 6
 The Board, acquiescing in the court's implicit determination that a revenue-only test was adequate to measure the substantiality of dealing and underwriting, shortly thereafter issued the order from which the SIA petitions in this case. Five bank holding companies,[6] in October 1988, sought Board approval for their affiliates to underwrite and deal in corporate debt and equity securities generally--all bank-ineligible securities--subject only to a proportional revenue limitation. The Board, reiterating its section 20 definition of securities which had been affirmed in Citicorp and concluding that a five to ten percent revenue limitation would preclude the affiliates from being "engaged principally" in dealing or underwriting, held that the proposed activity did not violate the Glass-Steagall Act. See J.P. Morgan & Co., Inc., et al., 74 Fed.Res.Bull. 192 (1989). The Board further determined that the proposed activity was permissible under section 4(c)(8) of the Bank Holding Company Act because it was "closely related to banking" and would produce substantial net public benefits. See id.
 
 II.
 
 7
 The SIA seeks again to challenge the Board's construction of the words "securities" and "engaged principally" in section 20 of the Glass-Steagall Act, this time in our court. The government cries foul; the issues the SIA would have us decide, it asserts, are precluded by the prior adjudication in the Second Circuit. The doctrine of issue preclusion serves the "dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation." Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326, 99 S.Ct. 645, 649, 58 L.Ed.2d 552 (1979). When a court determines an issue of fact or law that is actually litigated and necessary to its judgment, that conclusion binds the same parties in a subsequent action. See American Iron and Steel Institute v. EPA, 886 F.2d 390, 397 (D.C.Cir.1989); McLaughlin v. Bradlee, 803 F.2d 1197, 1201 (D.C.Cir.1986); Restatement (Second) of Judgments Sec. 27 (1982). The SIA, the Board, and each of the intervenors were parties in the earlier Citicorp litigation, and the SIA's petition before us revisits two section 20 challenges already litigated and resolved adversely to it by the Second Circuit. The parties were afforded a full and fair opportunity to advance their Glass-Steagall contentions, and the Second Circuit exhaustively analyzed and then rejected the SIA's view of the statute.
 
 
 8
 Seeking to escape application of issue preclusion, the SIA argues that we should revisit the Board's construction of "securities" for two reasons. The first is that the issue before us is really different than that presented to the Second Circuit, and secondly, the question is of national importance. To be sure, as the SIA vigorously asserts, the Citicorp case involved types of bank-ineligible securities that many would regard as less risky to handle than the ordinary corporate stocks and bonds which are covered by the Board order before us. But we do not see how that factual difference bears on the legal issues presented to and decided by the Second Circuit. There was (and is) no dispute that the word "securities" in section 20 covered all bank-ineligible securities regardless of the relative degree of risk associated with different bank-ineligible securities. The question before the Second Circuit was whether "securities" extended to bank-eligible securities (which are not particularly risky), and that question is the very same one that the SIA would have us decide. And it cannot be contended, even if that consideration were relevant, that the Second Circuit was blind to the implications of its decision, that somehow the court did not realize that a limited definition of securities in section 20 would permit affiliates to engage in a greater degree of underwriting and dealing in bank-ineligible securities of all kinds. The SIA itself argued this very point to the Second Circuit, warning that section 20 did not distinguish between different types of bank-ineligible securities in accordance with relative risk. Thus, although the court noted the narrow range of bank-ineligible securities before it, see Citicorp, 839 F.2d at 49, it did not in any way limit its holding by that observation:
 
 
 9
 We hold that it was not Congress' purpose in Sec. 20 to preclude a bank affiliate from engaging in the same activities to the same extent as a member bank and we uphold the Board's determination that the reference in Sec. 20 to "securities" does not encompass those securities which Sec. 16 allows banks themselves to underwrite.
 
 
 10
 Citicorp, 839 F.2d at 62.
 
 
 11
 Nor do we see any basis in logic or precedent to accept petitioner's contention that the national importance of the issue (and, implicitly, the assertion that the Second Circuit erred) justifies our re-examination. We are not so immodest as to believe that we have any special claim to decide national regulatory issues that have been brought before our sister circuits. The Supreme Court denied certiorari in Citicorp, and it is that Court's responsibility, not ours, to review court of appeals determinations of national importance.
 
 
 12
 Courts are admonished not to permit "[u]nreflective invocation" of issue preclusion to gloss over serious questions of fairness and the scope of prior litigation. See Montana v. United States, 440 U.S. 147, 162-64 & n. 11, 99 S.Ct. 970, 978-79 & n. 11, 59 L.Ed.2d 210 (1979). Mindful of the ingenuity of counsel who can virtually always point to some difference between the first and second case, however, we have been exceedingly reluctant to permit a litigant to avoid the force of preclusion doctrine by pleading "special circumstances." See, e.g., Western Coal Traffic League v. ICC, 735 F.2d 1408, 1411 (D.C.Cir.1984). Here, we are not even tempted to do so. Petitioner's effort to relitigate the construction of "securities" in this Circuit represents rather garden variety forum shopping. Society's interests in "conserv[ing] judicial resources ... and foster[ing] reliance on judicial action by minimizing the possibility of inconsistent decisions" bars the SIA from pressing those claims again in a new forum. Montana v. United States, 440 U.S. 147, 153-54, 99 S.Ct. 970, 973-74, 59 L.Ed.2d 210 (1979).[7]
 
 
 13
 We think petitioner is also precluded from challenging the Board's interpretation and implementation of "engaged principally," although this question is somewhat closer. Petitioner argues before us that a revenue test without more is inadequate and, in fact, hopelessly manipulable.[8] Petitioner did not make this argument in the Second Circuit, but the issue is nonetheless precluded because when the bank holding companies challenged the market share test as contrary to the language of section 20, their petition squarely presented the question whether a revenue limitation alone would reasonably comport with the "engaged principally" limitation. The SIA, it would seem, remained silent on this critical point. The Second Circuit in agreeing with the banks declared the market share limitation invalid and did not remand the case to the Board even though the Board itself had originally thought a revenue test alone was inadequate. The Second Circuit therefore necessarily held, even though only implicitly, that the revenue test alone was adequate. Apparently, petitioner did not seek rehearing on that question. But petitioner certainly could have presented the arguments raised here to the Second Circuit in response to the bank holding companies, either in its brief or on a petition for rehearing.
 
 
 14
 Whether petitioner actually argued that position is irrelevant, however, since preclusion because of a prior adjudication results from the resolution of a question in issue, not from the litigation of specific arguments directed to the issue. See Otherson v. Dep't of Justice, 711 F.2d 267, 273 (D.C.Cir.1983) (citing Cromwell v. County of SAC, 94 U.S. 351, 353, 24 L.Ed. 195 (1877)); Restatement (Second) of Judgments Sec. 27 comment c ("[I]f the issue [previously litigated] was one of law, new arguments may not be presented to obtain a different determination of that issue."). And that the court was not explicit in holding that a revenue test was by itself adequate is also irrelevant to its preclusive effect--by not remanding to the Board, the court necessarily decided that question. See American Iron and Steel Institute v. EPA, 886 F.2d 390, 397 (D.C.Cir.1989) (stating that even when an opinion is silent on a particular issue, issue preclusion is applicable if resolution of that issue was necessary to the judgment).
 
 III.
 
 15
 The SIA also attacks the Board order as a misapplication of section 4(c)(8) of the Bank Holding Company Act, 12 U.S.C. Sec. 1843(c)(8). Section 4(c)(8) permits a bank holding company to own the "shares of any company the activities of which the Board ... has determined (by order or regulation) to be so closely related to banking ... as to be a proper incident thereto...." 12 U.S.C. Sec. 1843(c)(8). The Board must also conclude, as part of its "proper incident" determination, that the proposed activity will produce benefits to the public that would outweigh possible adverse effects. See id.[9] Because no one presented the section 4(c)(8) issue to the Second Circuit in Citicorp, we are free to decide it. Unfortunately for petitioner, it appears to us that it has a weak argument on the merits because of the enormous deference we are obliged to give the Board's determination that the activities proposed are "closely related to banking," see Securities Industry Ass'n v. Board of Governors, 468 U.S. 207, 215-16, 104 S.Ct. 3003, 3008, 82 L.Ed.2d 158 (1984); 12 U.S.C. Sec. 1848, and that those activities will produce net benefits to the public, see American Land Title Ass'n v. Board of Governors, 892 F.2d 1059, 1065 (D.C.Cir.1989).
 
 
 16
 Section 4(c)(8) itself offers no guidance on what factors the Board must consider in determining whether an activity is closely related to banking. The Board, drawing from our opinion in National Courier Ass'n v. Board of Governors, 516 F.2d 1229 (D.C.Cir.1975), allows bank affiliates to engage in activities under section 4(c)(8) if "[b]anks generally provide services that are operationally or functionally so similar to the proposed services as to equip them particularly well to provide the proposed service." Id. at 1237. It is not clear that this elaboration is significantly more precise than the statutory formulation "closely related to banking." By using that statutory language, however, Congress quite clearly delegated to the Board the power to determine how closely related a particular activity must be to meet the closely related test, subject only to limited judicial review.
 
 
 17
 The argument the SIA makes here is really a variation on its primary Glass-Steagall claim: that underwriting and dealing in corporate debt and securities is particularly risky and therefore far removed from the safer traditional lending business of banks. Petitioner may well have set up a false dichotomy since the traditional lending business of banks, at least to corporate customers or foreign borrowers, has apparently become increasingly risky. In any event, as the Board noted, banks have developed a wide range of experience in private placement of debt and equity securities, the syndication of loans, the purchase and sale of securities as a fiduciary for others, the underwriting and dealing in bank-eligible government securities,[10] and even the very activities involved here, although practiced overseas. Banks have engaged in business lines that substantially surround the activities covered by the Board's order. And banks must, to survive, develop sophistication in the generic ability to evaluate creditworthiness, the capacity to structure new security issues, and the expertise to buy and sell securities in a secondary market.
 
 
 18
 Congress has apparently assumed, moreover, that underwriting and dealing in corporate securities were in a sense closely related to banking. Otherwise, it would not have expressly permitted, in section 20 of the Glass-Steagall Act, bank affiliates to engage in even a limited amount of securities dealing. To be sure, the Bank Holding Company Act, which introduced the phrase "closely related to banking," was passed over twenty years after Glass-Steagall. But given the history of the interrelationship between investment banking and commercial banking, which Glass-Steagall was designed to divide substantially, it is hard to say that the two overlapping spheres of the banking world are not "closely related." Therefore, once the Board has determined that a proposed bank affiliate securities activity is not prohibited by Glass-Steagall, it has never thought that such an activity did not meet the closely related test.
 
 
 19
 Petitioner asserts that the Board's cautious approach of requiring the bank affiliates to wait a year after approval before starting equity underwriting strongly supports their argument that the bank affiliates do not yet have the required expertise to engage in this business. To be fair, they have a point, but the Board reasonably contends that the delay was designed to ensure that the bank affiliates carefully assembled and organized the operational and managerial expertise, such as a back office staff, before commencing operations. That may well mean, as petitioner argues, that the bank affiliates will need to hire some employees of firms that comprise the SIA before they launch into these new ventures. Still, closely related to banking does not mean exactly the same as banking. Any time a bank affiliate starts a new section 4(c)(8) activity, it must acquire new talent with which to challenge the competition.
 
 
 20
 Petitioner's final quarrel with the Board is a challenge to the Board's determination that the proposed activity will afford greater public benefits than detriment, the second component of the section 4(c)(8) exemption. Once again, but in a different context, petitioner claims that the increased risk to banks, because of the new activities of affiliates, outweighs any public benefits. The Board was not, however, insensitive to that concern. The bank affiliates must maintain a capital ratio significantly higher than that which the SEC requires for security firms. That means that the affiliates will have an extra cushion to protect against the possibility of losses from security dealings.
 
 
 21
 As for the classic Glass-Steagall-related worries that banks will be drawn into a conflict of interest in the allocation of credit to customers of their securities affiliates or that prospective losses by the affiliates would jeopardize the banks' reputations, the Board insisted on a comprehensive series of "firewalls" to insulate the affiliates from the banks. The banks are not permitted to extend credit, nor purchase from or sell assets to the affiliates. Nor are the banks permitted to extend credit to customers of the affiliates if that might be viewed as enhancing the marketability or creditworthiness of an issue underwritten or distributed by the affiliate. The Board also prohibits the bank from extending credit to purchase any such securities or pay the principal, interest, or dividends on those securities, and the bank may not participate in the marketing of any securities issue distributed by the affiliate.
 
 
 22
 Although petitioner further complains that the bank affiliates will constitute unfair competition because of the affiliates' supposed access to allegedly low cost bank funds, we do not see the merit in this argument. The banks, as we noted, may not transfer funds to their security affiliates, and even the bank holding companies need Board approval before passing capital to the affiliates. (Of course, the bank holding company has no access to any "low cost" deposits of the bank.) Indeed, because of the higher capital ratios required of the bank affiliates, they will arguably be at a competitive disadvantage vis-a-vis the SIA's members.
 
 
 23
 Posed against this diminished risk of adverse consequences are the uncontested public benefits of the Board's order. The entry of bank affiliates will likely increase competition in the underwriting markets, promote greater convenience and efficiency for customers, and improve the ability of United States banks to compete effectively in world markets. Comparing these welfare enhancing public benefits with the risk of adverse consequences, substantial evidence supported the Board's view that the balance tilted strongly in favor of permitting bank affiliates to participate in bank-ineligible securities transactions. See American Land Title Ass'n v. Board of Governors, 892 F.2d 1059, 1065 (D.C.Cir.1989).
 
 
 24
 * * * * * *
 
 
 25
 For the above reasons, the petition for review is Denied.
 
 
 
 [1]
 Underwriting is the public distribution of new securities issues. Dealing typically refers to the secondary buying and selling of securities for one's own account
 
 
 [2]
 Section 20 provides in pertinent part:
 After one year from June 16, 1933, no member bank [of the Federal Reserve System] shall be affiliated ... with any corporation, association, business trust, or other similar organization engaged principally in the issue, flotation, underwriting, public sale, or distribution at wholesale or retail or through syndicate participation of stocks, bonds, debentures, notes, or other securities....
 12 U.S.C. Sec. 377. An "affiliate" of a bank is a firm effectively controlling or controlled by the bank, or a firm effectively controlled by a parent entity that in turn controls a bank. See 12 U.S.C. Sec. 221a(b).
 
 
 [3]
 The Board decided that a five to ten percent range for both tests would not violate the "engaged principally" limitation. The Board then set the level initially at the low end of the range, 5 percent, for both tests and stated that it would review the level after one year
 
 
 [4]
 The court decided that the Board had not addressed its apparently inconsistent definitions of "securities" in sections 20 and 32. In 1936, the Board had specifically exempted bank-eligible securities from the meaning of securities in section 32, the provision that prohibits interlocking personnel, thereby suggesting that the meaning of securities ordinarily includes bank-eligible securities. See Citicorp, 839 F.2d at 53-54
 
 
 [5]
 Indeed, in Citicorp the Board took the view that a market share limitation was important because a revenue limit alone might be manipulable through "the deliberate creation of a large base of eligible activity." Citicorp, 73 Fed.Res.Bull. 473, 481 n. 29 (1987)
 
 
 [6]
 The applicants were J.P. Morgan & Co. Incorporated, The Chase Manhattan Corporation, Bankers Trust New York Corporation, Citicorp, and Security Pacific Corporation. These bank holding companies are now intervenors before this court. The Chase Manhattan Corporation applied to underwrite and deal in debt securities and preferred stock only
 
 
 [7]
 We also reject the SIA's argument that collateral estoppel does not apply when a federal agency is the defendant in the litigation. The case cited for this remarkable proposition, American Medical Int'l, Inc. v. Secretary of Health, Educ. & Welfare, 677 F.2d 118 (D.C.Cir.1981), involved the "offensive" use of collateral estoppel by a private plaintiff that was not a party to the previous proceeding. Our concern in American Medical Int'l focused on the prospect that the first case to resolve an issue against the federal government would bind all future cases if offensive nonmutual collateral estoppel were applicable. See id. at 121-22. In contrast, in this petition for review, the Board is using issue preclusion defensively against the same party that litigated the earlier case
 
 
 [8]
 The SIA contends that banks will "pad" their affiliates' revenue bases with unrelated activities. Petitioner also advances the less tenable view that a revenue-based limit might actually encourage affiliates to engage in loss-generating activities, presumably "to make up in volume" what they cannot obtain in spreads
 
 
 [9]
 The "balancing" component of section 4(c)(8) provides in pertinent part:
 In determining whether a particular activity is a proper incident to banking ... the Board shall consider whether its performance by an affiliate of a holding company can reasonably be expected to produce benefits to the public, such as greater convenience, increased competition, or gains in efficiency, that outweigh possible adverse effects, such as undue concentration of resources, decreased or unfair competition, conflicts of interests, or unsound banking practices.
 12 U.S.C. Sec. 1843(c)(8).
 
 
 [10]
 We do not entertain petitioner's argument that since government securities are generally distributed through competitive bidding, banks lack experience in negotiated transactions. That contention apparently was not raised before the Board, and we will not consider it on review. See Whitney Nat'l Bank v. Bank of New Orleans and Trust Co., 379 U.S. 411, 419-21, 85 S.Ct. 551, 556-58, 13 L.Ed.2d 386 (1965)