195 F.3d 28 (D.C. Cir. 1999)
 Independent Community Bankers of America, Petitioner
v.
Board of Governors of the Federal Reserve System, Respondent
Citigroup, Inc., Intervenor
 No. 98-1482
 United States Court of Appeals
FOR THE DISTRICT OF COLUMBIA CIRCUIT
 Argued October 1, 1999
Decided November 2, 1999
 
 On Petition for Review of an Order of the Board of Governors of the Federal Reserve System
 Charles D. Reed argued the cause for petitioner. With him on the briefs were Roger J. Lerner, and Robert J. McManus.
 Katherine H. Wheatley, Assistant General Counsel, Board of Governors of the Federal Reserve System, argued the cause for respondent. With her on the brief were James V. Mattingly, Jr., General Counsel, and Richard M. Ashton, Associate General Counsel.
 Douglas M. Kraus argued the cause and filed the brief in support of respondent for intervenor Citigroup, Inc.
 Sarah A. Miller was on the brief for amicus curiae American Bankers Association Securities Association.
 Before: Edwards, Chief Judge, Wald and Williams, Circuit Judges.
 Opinion for the Court filed by Circuit Judge Williams.
 Williams, Circuit Judge:
 
 
 1
 Travelers Group, Inc. applied to the Board of Governors of the Federal Reserve System to become a bank holding company. Under 3(a)(1) of the Bank Holding Company ("BHC") Act, 12 U.S.C. 1842(a)(1) (1994), Travelers needed Board approval before it could proceed with its plan to acquire all of the voting stock of an existing bank holding company, Citicorp, Inc., and thereby add all of Citicorp's banking and nonbanking subsidiaries to its group of companies. After completing this transaction Travelers planned to rename itself Citigroup, Inc. The Board approved Travelers's application on the condition that the new enterprise divest itself of its insurance business within two years, so as to comply with 4(a)(2) of the BHC Act, 12 U.S.C. 1843(a)(2) (1994). And it found the acquisition in compliance with 20 of the Glass-Steagall Act, 12 U.S.C. 377 (1994), as none of Citigroup's affiliates would derive more than 25% of its gross revenues from bank ineligible securities. See Order Approving Formation of a Bank Holding Company and Notice to Engage in Nonbanking Activities, 84 Fed. Res. Bull. 985, 985 (1998), reprinted in J.A. 1, 3-4 ("1998 Order").
 
 
 2
 The Independent Community Bankers of America ("ICBA"), representative of 5300 "community banks," i.e., relatively small and local ones, petitions for review of the Board's approval order. It claims that Citigroup's obligation to dispose of its insurance business within two years, as specified by 4(a)(2) of the BHC Act, is not good enough. As to Glass-Steagall, ICBA says that the Board's construction of 20--imposing only a proportional limit on revenues from ineligible activities--is too loose, and should be supplemented either with some absolute volumetric limit so as to prevent creation of a diversified financial services behemoth, or with a case-specific risk analysis, or both. ICBA objected to the acquisition in the Board's proceedings, as required for standing to challenge the action in court. Jones v. Board of Governors of the Fed. Reserve Sys., 79 F.3d 1168, 1170-71 (D.C. Cir. 1996). We have jurisdiction to review under 12 U.S.C. 1848 (1994). We find the Board's interpretation and application of the statutes reasonable, and therefore affirm.
 
 
 3
 * * *
 
 
 4
 Section 4 of the BHC Act, 12 U.S.C. 1843, limits the permissible financial activities for bank holding companies:
 
 
 5
 Except as otherwise provided in this chapter, no bank holding company shall --
 
 
 6
 ...
 
 
 7
 (2) after two years from the date as of which it be-comes a bank holding company, ... retain direct or indirect ownership or control of any voting shares of any company which is not a bank or bank holding company or engage in any activities other than (A)those of banking or of managing or controlling bank sand other subsidiaries authorized under [the BHC Act]..., and (B) those permitted under [section 4(c)(8) of the BHC Act]....
 
 
 8
 The Board is authorized ... to extend the two year period ... for not more than one year at a time ... but no such extensions shall in the aggregate exceed three years.
 
 
 9
 12 U.S.C. 1843(a) (1994) (emphasis added).
 
 
 10
 Travelers, the acquiring entity, was engaged in various activities, mainly insurance, not allowed for bank holding companies under exceptions (A) and (B). Accordingly, the emerging bank holding company could not lawfully "retain" stock in any subsidiary conducting that business for more than two years after the transaction by which it became a bank holding company. The Board thus made its approval of the Travelers-Citicorp transaction contingent on a commitment that Citigroup would conform to the two-year divestiture requirement. ICBA offers a series of arguments designed to prove that this literal compliance with 4(a)(2) is inadequate.
 
 
 11
 Section 5(b) of the BHC Act and Board practice. First, ICBA urges that 5(b) of the BHC Act, 12 U.S.C. 1844(b) (1994), a general grant of power to issue regulations and orders so as to carry out the purposes of the Act,[1] requires the Board to reject applications that would frustrate its purpose. Here, ICBA claims, Citigroup is thwarting the purposes of the BHC Act because it has no bona fide intent to divest itself of its insurance activities. Instead, it is using its temporary power to mix large-scale insurance and banking to put pressure on Congress to amend the BHC Act to allow that mix. ICBA also claims Citigroup will use the two years to gain competitive advantage over other financial corporations.
 
 
 12
 ICBA is correct that Citigroup and the Board are in favor of amending the BHC Act. The officers of Citicorp and Travelers have openly said that they hope that Citigroup's structure will encourage Congress to amend the BHC Act. See Trading Places: Travelers/Citicorp Press Conf., CNNfn (CNN television broadcast, Apr. 6, 1998), available in LEXIS, NEWS library, ALLNEWS File (quoting Sanford Weill, Chairman and CEO of Travelers). And the Board has sent a unanimous letter to Congress supporting amendment of the BHC Act to permit the combination of banking and insurance activities. See id. (quoting John Reid, CEO of Citicorp). (Recent news reports indicate, in fact, that Citigroup and the Board may be about to have their way. See Michael Schroder, "Glass-Steagall Compromise Is Reached: Lawmakers Poised To Pass Banking-Law Overhaul After
 
 
 13
 Perhaps ICBA means to argue that the contingent character of Citigroup's intent--the intent to comply with the law unless Congress amends the BHC Act--so deeply reduces the probability of compliance that its commitment should be disregarded. But the statute does not assign any role to the emerging entity's reluctance to divest; and if Citigroup ignores the Board's order (and the statutory mandate), the Board has adequate tools to force it into compliance and punish its misbehavior. See, e.g., 12 U.S.C. 1847 (1994).
 
 
 14
 ICBA is on similarly thin ice with its charge that Citigroup seeks an unfair competitive advantage. As part of its conditional approval, the Board secured commitments from Citigroup designed to prevent it from leveraging its grace period into a competitive advantage or creating corporate relationships that could not be easily unwound. See 1998 Order at 86-93.
 
 
 15
 So we are rather uncertain just what "purpose" of the BHC Act ICBA believes will be thwarted by the Board's adherence to its language. But even if there is some such frustrated purpose, there is no basis for ICBA's assumption that the Board could have freely used the general terms of 5(b) to trump specific statutory language. ICBA points to instances where, in ICBA's view, the Board did so. See, e.g., Citicorp (South Dakota), 71 Fed. Res. Bull. 789 (1985); Wilshire Oil Co. v. Board of Governors of the Fed. Reserve Sys., 668 F.2d 732, 733 (3d Cir. 1981). But the Board in those cases found that the proposed transaction had no purpose other than to evade the BHC Act's provisions. See Citicorp, 71 Fed. Res. Bull. at 789 (ordering that Citicorp could not acquire a state chartered South Dakota bank to take advantage of a state law allowing out-of-state bank holding companies to engage in large-scale insurance activities so long as they did not compete with South Dakota insurance or banking interests);Wilshire Oil, 668 F.2d at 733 (upholding the Board's ruling that a bank holding company could not opt out of the BHC Act by making a small change to its withdrawal policy that it had no intent to enforce).[2] Here the Board specifically found that the merger was not an attempt to evade the prohibitions of the BHC Act. 1998 Order at 11.
 
 
 16
 More importantly, since those decisions the Supreme Court has ruled that the Board cannot use 5(b) to bend its statutorily granted authority. Board of Governors of the Fed. Reserve Sys. v. Dimension Fin. Corp., 474 U.S. 361, 373 n.6 (1986). The Eleventh Circuit has applied the Dimension decision to overturn a Board ruling factually similar to the one in Wilshire. See Florida Dep't of Banking & Finance v. Board of Governors of the Fed. Reserve Sys., 800 F.2d 1534 (11th Cir. 1986). Here, too, the Board cannot exercise nonexistent authority to alter the statutory text.
 
 
 17
 ICBA is also incorrect that the Board is bound by its cases decided under 4(c)(9) of the BHC Act, 18 U.S.C. 1843(c)(9), which allows the Board to exempt foreign bank holding companies from the Act upon determining that an exemption would not be substantially at variance with the Act's purposes.[3] In Fortis, 1994 Fed. Res. Interp. Ltr. LEXIS 313, and a related line of letter rulings, the Board granted exemptions, but imposed substantial restrictions on Fortis's and the other companies' insurance activities. ICBA asks why not here? But the Board distinguished those cases as being based on the foreign bank holding companies' unique ability to expand their insurance businesses during any period of exemption, and on the Board's broad discretionary power under 4(c)(9) to grant or withhold exemption altogether. See 1998 Order at 87 n.102.
 
 
 18
 Board regulations. ICBA argues that the Board's regulations require Citigroup to come into compliance with 4(a)(2) as quickly as possible and to submit a detailed divestiture plan before, or soon after, the merger's approval. See 12 C.F.R. 225.138(b)(1) (1999) ("[T]he affected company should endeavor and should be encouraged to complete the divestiture as early as possible during the specific period."); id. 225.138(b)(2) (1999) ("[A bank holding company] should generally be asked to submit a divestiture plan promptly.").But these regulations are explicitly labelled "statement[s] of policy," and accordingly bind neither the agency nor the public. Syncor Int'l Corp. v. Shalala, 127 F.3d 90, 94 (D.C. Cir. 1997). We note, in any event, that the Board here explained that a detailed plan was unnecessary because of the voluminous material in the record concerning Travelers's ability to comply with the divestiture requirement. See 1998 Order at 12.
 
 
 19
 * * *
 
 
 20
 ICBA's second claim rests on 20 of the Glass-Steagall Act (the "Act"), 12 U.S.C. 377.[4] The Act limits the securities-related activities of commercial banks and their affiliates. Section 16 of the Act, 12 U.S.C. 24 (Seventh), prohibits banks from underwriting or dealing in any securities, but specifically permits them to underwrite United States government obligations and state or municipal general obligations. The allowed activities are commonly referred to as "bank-eligible securities," while all others are called, not surprisingly, "bank-ineligible securities." See Securities Industries Ass'n v. Board of Governors of the Fed. Reserve Sys., 900 F.2d 360, 361 (D.C. Cir. 1990). In contrast to 16's general prohibition, 20 permits companies affiliated with banks to underwrite or deal in securities so long as the affiliate is not "engaged principally" in those activities:
 
 
 21
 [N]o member bank [of the Federal Reserve System] shall be affiliated ... with any corporation, association, business trust, or other similar organization engaged principally in the issue, flotation, underwriting, public sale, or distribution ... of stocks, bonds, debentures, notes, or other securities....
 
 
 22
 12 U.S.C. 377 (1994) (emphasis added). The Board and the courts have read this limit as applying only to bank-ineligible securities, see Securities Industry Ass'n v. Board of Governors of the Fed. Reserve Sys., 839 F.2d 47, 58-62 (2d Cir. 1988) ("SIA I"), and ICBA does not contest that reading.
 
 
 23
 In 1996 the Board adopted its current test, stating that if an affiliate derives more than 25% of its revenues from bank ineligible securities, it is "engaged principally" in such activities. See Revenue Limit on Bank-Ineligible Activities of Subsidiaries of Bank Holding Companies Engaged in Underwriting and Dealing in Securities, 61 Fed. Reg. 68,750, 68,754 (1996) ("1996 Order"). Instead, says ICBA, at least for a merger of this size the Board should examine the risks associated with the particular kind of bank-ineligible securities at issue and the absolute size of the merging entities' ineligible securities activities. Under those standards, ICBA urges, Citigroup--which contains several large securities companies including Salomon Smith Barney--is "engaged principally" in bank-ineligible securities activities.[5]
 
 
 24
 We must first consider our jurisdiction. The rule applied to the Travelers-Citicorp transaction is the rule adopted in the Board's 1996 Order, which was reviewable in the court of appeals by a petition filed "within thirty days after the entry of the Board's order." See 12 U.S.C. 1848. ICBA sought no review. Responding to the suggestion that this inaction might preclude part of its appeal, ICBA speaks as if it challenged only the application of the 25% rule to this case rather than the rule itself. But in fact there is not a great deal left to ICBA's appeal if we must assume the lawfulness of the rule's standard--a 25% ceiling on the ineligible businesses' contribution to revenue, functioning as the exclusive limit under 20. So we must decide whether the time limit in 1848 bars our review of ICBA's substantive claim against the rule itself.
 
 
 25
 We have frequently said that a party against whom a rule is applied may, at the time of application, pursue substantive objections to the rule, including claims that an agency lacked the statutory authority to adopt the rule, even where the petitioner had notice and opportunity to bring a direct challenge within statutory time limits. See Graceba Total Communications, Inc. v. FCC, 115 F.3d 1038, 1040-41 (D.C. Cir. 1997); Public Citizen v. NRC, 901 F.2d 147, 152 & n.1 (D.C. Cir. 1990); NLRB Union v. Federal Labor Relations Auth., 834 F.2d 191, 195 (D.C. Cir. 1987); Montana v. Clark, 749 F.2d 740, 744 n.8 (D.C. Cir. 1984) ("[W]here ... the petitioner challenges the substantive validity of a rule, failure to exercise a prior opportunity to challenge the regulation ordinarily will not preclude review."); Functional Music, Inc. v. FCC, 274 F.2d 543, 546 (D.C. Cir. 1958) ("[U]nlike ordinary adjudicatory orders, administrative rules and regulations are capable of continuing application; limiting the right of review of the underlying rule would effectively deny many parties ultimately affected by a rule an opportunity to question its validity."). Although the discussions of the application exception in several of these cases were dicta, Graceba clearly applied the exception. 115 F.3d at 1040-41 (excusing failure to challenge May 1994 rulemaking). By contrast, we have said that procedural attacks on a rule's adoption are barred even when it is applied. See Jem Broadcasting Co. v. FCC, 22 F.3d 320, 325 (D.C. Cir. 1994) ("[C]hallenges to the procedural lineage of agency regulations, whether raised by direct appeal, by petition for amendment or rescission of the regulation or as a defense to an agency enforcement proceeding, will not be entertained outside the 60-day period provided by statute."); NRDC v. NRC, 666 F.2d 595, 602-03 (D.C. Cir. 1981) (dismissing petition alleging procedural defects as untimely); see also Public Citizen, 901 F.2d at 152 ("[A] statutory review period permanently limits the time within which a petitioner may claim that an agency action was procedurally defective.").
 
 
 26
 In one case, Raton Gas Transmission Co. v. FERC, 852 F.2d 612 (D.C. Cir. 1988), we suggested that even at a time of application petitioners may obtain review of an agency regulation outside of a statutorily prescribed period only for "gross violations of statutory or constitutional mandates, or denial of an adequate opportunity to test the regulation in court." Id. at 615. We offered no explanation for suddenly limiting permissible statutory challenges to ones of "gross" violation, and we proceeded to reach the merits of the petitioner's claim, see id. at 617. Our later cases have returned to the long standing position allowing substantive challenges to the application of a regulation. See, e.g., Graceba, 115 F.3d at 1040; Public Citizen, 901 F.2d at 152 & n.1. As a result, we think it inappropriate to follow the language of Raton. See Haynes v. Williams, 88 F.3d 898, 900 n.4 (10th Cir. 1996) ("[W]hen faced with an intra-circuit conflict, a panel should follow earlier, settled precedent over a subsequent deviation therefrom."); Texaco Inc. v. Louisiana Land & Exploration Co., 995 F.2d 43, 44 (5th Cir. 1993) ("In the event of conflicting panel opinions ... the earlier one controls, as one panel of this court may not overrule another.")
 
 
 27
 Finally, one of our cases held that (absent special exceptions, as for a challenger that lacked a meaningful opportunity to challenge the rule during the review period) even a party subjected to a rule could not bring a substantive challenge to the rule at the time of enforcement. Eagle Picher v. EPA, 759 F.2d 905, 914 (D.C. Cir. 1985) (the "mere fact that the rule is applied to the petitioner after the statutory period expires" is not enough to permit review); see also id. at 911-12 (discussing the limited exceptions). But in Eagle-Picher the statute authorizing judicial review explicitly prohibited all review after the prescribed period. See 42 U.S.C. 9613(a) (1982) ("Any matter with respect to which review could have been obtained under this subsection shall not be subject to judicial review in any civil or criminal proceeding for enforcement."), quoted in Eagle-Picher, 759 F.2d at 911. The Administrative Conference of the United States in 1982 urged Congress not to prohibit challenges to the statutory authority for a rule unless there were a compelling need for prompt compliance on a national or industry wide basis, see Recommendations of the Administrative Conference, 47 Fed. Reg. 58207, 58210 (1982), and the dearth of statutes that prohibit review after the statutory period has run suggests that Congress has generally agreed. See generally Frederick Davis, "Judicial Review of Rulemaking: New Patterns and New Problems," 1981 Duke L.J. 279, 281, 28290 (reviewing statutes and cases). The statute at issue here, 12 U.S.C. 1848 (1994), contains no such explicit bar. Accordingly, we may now turn to the merits and consider ICBA's attack on the Board's exclusive 25% revenue limit.
 
 
 28
 Section 20 of the Glass-Steagall Act prohibits a member bank from being affiliated with any corporation "engaged principally" in various bank-ineligible securities transactions. We agree with the Second Circuit that the term "engaged principally" is "intrinsically ambiguous." SIA I, 839 F.2d at 63. Thus we defer to any reasonable Board interpretation. See Chevron U.S.A. Inc. v. NRDC, 467 U.S. 837, 842-43 (1984).
 
 
 29
 ICBA argues that 20 is designed to minimize risk, and therefore the Board cannot confine itself to the revenue share contributed by bank-ineligible activities but must examine such risk variables as the nature of the bank-ineligible assets at issue and the absolute size of the merger participants. We first address the Board's selection of 25% for the limit, and then these two special objections.
 
 
 30
 Before 1987 the Board had no occasion to test the meaning of 20. In 1987, in response to specific requests to allow non-bank affiliates to engage in underwriting and dealing of bank-ineligible securities, the Board decided that an affiliate is "engaged principally" in bank-ineligible activities if: (1) the gross revenue from such activities exceeds 5-to-10 percent of the affiliate's total gross revenues; and (2) the affiliate's activities in each type of ineligible security accounts for more than 5-to-10 percent of the total domestic market for that activity in the prior year. See J.P. Morgan & Co., 73 Fed. Res. Bull. 473 (1987). As a prudential matter, the Board initially limited the share of ineligible revenue to 5% so that it could gain experience in supervising such affiliates. The Second Circuit struck down the market share portion of the test, leaving in place only the gross revenues test. SIA I, 839 F.2d at 67 (2d Cir. 1988). It reasoned that Congress had been fully aware of the growing proportional role of commercial banks in securities origination, and yet had explicitly chosen a formula directly reflecting its anxiety "over the perceived risk to bank solvency resulting from their over involvement in securities activity." Id. at 68. In Securities Industries Ass'n v. Board of Governors of the Fed. Reserve Sys., 900 F.2d 360, 364 (D.C. Cir. 1990), we noted that the Second Circuit's decision had necessarily upheld a pure revenue share test as an adequate definition of "engaged principally."
 
 
 31
 In 1989, the Board raised the ceiling on affiliates' ineligible activities to 10% of total revenue. See 1996 Order at 68751 & n.10. Finally, in 1996 it raised the ceiling to the current 25%.1996 Order at 68754. It noted at the time that some commentators worried that its new rule would allow banks to "affiliate with the nation's largest investment banks, contrary to the express purpose of section 20 of the Glass-Steagall Act." Id. But it set the concern aside with a look at history, identifying the controlling question as whether its test would have allowed the sort of securities affiliations prevalent in the 1920s and 1930s--the apparent sources of congressional concern. Id. At that time, firms "deriving more than 25% of their income from underwriting and dealing in securities were common." Id.
 
 
 32
 In its 1996 Order the Board also considered--and rejected--the idea that increasing the gross revenues limit from 10% to 25% would cause "an increased risk to the safety and soundness or reputation of the nation's banks or to the federal safety net." 1996 Order at 68755. It based that conclusion on bank holding companies' demonstrated ability to manage the risks of investment banking over the previous nine years, the substantial safeguards in place to insulate banks from the failure of their affiliates, and the independent regulatory requirements administered by the Securities Exchange Commission that protect against insolvency of 20 affiliates. Id.
 
 
 33
 Where a statute can reasonably be understood to invite an agency to draw a quantitative proportional line, it is rare that a court can reject the agency's selection of one percentage over another. We see no basis for doing so here. Accordingly, we turn to ICBA's main attack, which is directed to whether the statute allows the Board to choose a purely quantitative proportional line and thereby to disregard other indicia of risk and/or the absolute level of sales volume.
 
 
 34
 Risk. In its 1996 Order, the Board determined that 20 does not allow for an independent examination of the risk associated with the particular type of securities activities at issue. Instead, the Board may only decide whether an affiliate is "engaged principally" in bank-ineligible activities. 1996 Order, 61 Fed. Reg. at 68754 ("Congress itself has decided when a company's risks of underwriting and dealing are too great to allow affiliation with a bank: whenever they constitute a principal activity of that company."). The Board decided that more individualized analyses would be unworkable, and a case-by-case analysis would produce substantial uncertainty among affiliates and examiners. Id. at 68754.(Recall that the limit endures, rather than being a one-shot issue at a moment of acquisition.) Moreover, the Board found that the level of risk from an affiliation is already examined as part of the required analysis under the BHC Act. See 12 U.S.C. 1842(c); 1998 Order at 14-21, 74 n.19;1996 Order at 68755. Although this analysis is limited to the moment a company applies to become a bank holding company, the Board has continuing authority to examine the investment activities of affiliates whose investments put the bank holding company's subsidiary bank at risk. See 12 U.S.C. 1844(e)(1). The Board's decision appears entirely reasonable in light of Congress's chosen language.
 
 
 35
 Absolute sales volume. As we observed before, the Second Circuit in SIA I found that the Board lacked the power to use a market share test. 839 F.2d at 67-68. It nonetheless left open the possibility of a volumetric limit of sales, id. at 68, an option the Board had rejected on the ground that it was too easily subject to manipulation, id. at 67. Thus, ICBA is correct to observe that no court has rejected the lawfulness of such a volumetric limit. Nor do we do so here. But at the same time we believe that the phrase "engaged principally" strongly suggests, as the Second Circuit observed, an overriding concern with risks due to a bank affiliate's "over involvement" in securities activity. Accordingly, we believe a test addressed solely to the ineligible securities business's proportional contribution to revenue is at least permissible under 20.
 
 
 36
 * * *
 
 
 37
 ICBA concludes with a novel claim that the Board's action violates the constitutionally required separation of powers. Had the Board acted in violation of Congress's will, of course there would be a logical claim that such an assertion of power by a part of the executive branch violated "separation of powers," but no such claim would be necessary. Because it is undisputed that the Board can exercise only powers granted by Congress, and (unlike the President) has none supplied directly by the Constitution, it appears that the activities of the Board (and other such agencies) will likely never call for the sort of analysis provided by the tripartite framework of Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 63738 (1952) (Jackson, J., concurring), designed to take account of powers held directly by the President.
 
 
 38
 * * *
 
 The Board's order is
 
 39
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 12 U.S.C. 1844(b) provides in relevant part:
 The Board is authorized to issue such regulations and orders as may be necessary to enable it to administer and carry out the purposes of this chapter and prevent evasions there of. Last-Minute Deals," Wall St. J., Oct. 25, 1999, at A2.) But 4(a)(2) makes no mention of applicants' legislative hopes or schemes, and the Board's order, which ICBA acknowledges tracks the statutory language, clearly requires Citigroup to make the necessary divestitures within the specified time period. See 1998 Order at 3, 12-13, 18, 66-67, 89-90, 107.There is not the slightest suggestion that the Board would have applied the statute any other way if its policy views had been different.
 
 
 [2]
 ICBA also argues that the Board has regularly departed from the statutory text by granting grace periods to existing bank holding companies whose acquisitions cause them to violate 4(a)(1) of the BHC Act, 12 U.S.C. 1843(a)(1). This case presents no opportunity to review the Board's practice of granting grace periods under 4(a)(1).
 
 
 [3]
 Section 4(c)(9) of the BHC Act, 18 U.S.C. 1843(c)(9) provides in relevant part:
 (c) The prohibitions in this section shall not apply to...
 (9) ... [a] company organized under the laws of a foreign country ... if the Board ... determines that ... the exemption would not be substantially at variance with the purposes of this chapter and would be in the public interest.
 
 
 [4]
 The Glass-Steagall Act is the common name for several scattered provisions of the Banking Act of 1933.
 
 
 [5]
 ICBA, in advocating an absolute volumetric test argued that one of the proper units of analysis was Citigroup as a whole, whereas the Board continued its policy of examining the businesses only subsidiary by subsidiary. In light of our disposition of the case we need take no position on this issue.